UNITED STATES of America,
Plaintiff–Appellee,

v.

Spencer Ray TILMON, Defendant–Appellant.

No. 93–2329.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 15, 1993.

Decided March 24, 1994.

Larry Wszalek (argued), Office of U.S. Atty., Madison, WI, for plaintiff-appellee.

Robert G. Malone (argued), St. Paul, MN, for defendant-appellant.

Before CUDAHY, FLAUM and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

A jury found the defendant, Spencer Ray Tilmon, guilty of the armed robbery of a Wisconsin bank, and the court sentenced him to 70 months' imprisonment. On appeal, Tilmon contends that the police transformed an investigatory stop into an arrest without probable cause; that the government failed to prove him guilty beyond a reasonable doubt; and that the district court erred in refusing to instruct the jury on the meaning of reasonable doubt. We affirm.

## I. FACTS

Before trial, a hearing was held on Tilmon's motion to suppress. The evidence related to an alleged unlawful arrest occurring when Tilmon's car was stopped on the highway. The district court denied the motion to suppress. Subsequently, a jury found Tilmon guilty of armed bank robbery, 18 U.S.C. § 2113.

The evidence at the pre-trial hearing and at trial showed that a bank robbery had occurred in Eau Claire, Wisconsin, on June 18, 1992, at about 11:05 a.m.; $3,786 was taken. The suspected getaway car had been parked around the corner from the bank. The robber was described as a black male in his early twenties, 5'10" tall and weighing 160 pounds. He had worn black netting over his face, black sweat pants with several stripes down the side and a hooded tan sweat jacket with a dark blue stripe across the chest.

Police radio dispatches indicated that a blue Mustang with a gray stripe, bearing Minnesota license plates, was involved in the 11:00 a.m. robbery. At 1:05 p.m., Trooper Lewis was parked at Exit 19 off Interstate 94, about 50 miles from Eau Claire, when he saw a dark blue Mustang with a light gray or silver stripe and Minnesota license plates pass him. The car was heading away from Eau Claire toward Minnesota. Lewis fol-

lowed the Mustang and radioed for back-up units. The police dispatcher's log indicates that Lewis sent a message saying that the driver of the Mustang "slid down in the driver's seat" as the police car approached. A back-up unit arrived, drove up beside the Mustang and ascertained that it was being driven by a black male.

After Lewis' back-up arrived, the police cars activated their flashing lights and Tilmon pulled over. Over a loud speaker, Tilmon was informed by Officer Klanderman that he should get out of the car with his hands up and lie face down on the shoulder of the road. Tilmon immediately complied. (According to Officer Klanderman, some of the weapons were pointed at Tilmon, and some were pointed at his car.) After he lay down as directed, Tilmon was handcuffed and placed in a squad car. A shotgun was pointed at Tilmon's head while he was handcuffed, searched and seated in the squad car. Within a few minutes, Lewis read Tilmon his *Miranda* rights, and he was advised that he was in custody for investigation of an armed robbery. Tilmon agreed to let the police search his car. Nothing was found in the car that would connect him with the robbery. Tilmon was taken to the police station, questioned and released within an hour.

At the scene of the highway stop, Tilmon's car had been effectively blocked. There were at least five squad cars abreast of and behind his car, and another police car stopped one-quarter mile ahead of Tilmon's car on the shoulder of the road for use in the event Tilmon tried to flee. Officer Klanderman testified that drawing weapons was standard procedure for a felony stop "for the safety of the officers and any other persons that may be in the area."

## II. POLICE CONDUCT PRIOR TO ARREST

In reviewing a motion to suppress evidence, we review for clear error. *United States v. Wilson*, 2 F.3d 226, 229 (7th Cir. 1993), *pet'n. for cert. filed* Jan. 3, 1994; *United States v. Rice*, 995 F.2d 719, 722 (7th Cir.1993); *United States v. Spears*, 965 F.2d

262, 269 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *United States v. Rice,* 995 F.2d at 722.

■ In reviewing a suppression motion, we may consider evidence introduced both at the pre-trial hearing and at the trial itself. *See United States v. Chapman,* 954 F.2d 1352, 1357 n. 5 (7th Cir.1992) (evidentiary hearing transcript not in appellate record, so court bases review of motion to suppress on trial testimony); *United States v. Ferreira,* 821 F.2d 1, 3 n. 3 (1st Cir.1987) (normally court only reviews record created at suppression hearing, but here court reviewed trial transcript as well).

■ The government argues that the initial highway stop was justified on the basis of information the arresting officers had received from the police radio transmissions and that, notwithstanding the show of force used to effect the stop, it did not constitute, at the outset, an arrest. Of course, certain seizures of the person need not be supported by probable cause. An investigatory stop not amounting to an arrest is authorized if the officer making the stop is "able to point to specific and articulable facts" that give rise to a reasonable suspicion of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Adebayo,* 985 F.2d 1333, 1339 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual as well as on the reason for the restraint. *United States v. Chaidez,* 919 F.2d 1193, 1197 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991), citing *United States v. Serna–Barreto,* 842 F.2d

965, 966 (7th Cir.1988). Reasonable suspicion depends, in part, on some minimal level of objective justification for making a stop. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The totality of the circumstances controls. "The process does not deal with hard certainties, but with probabilities." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981).

Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest. For example, probable cause may be required when police restraint is so intrusive that, while not technically an "arrest," it may be "tantamount" to an arrest. *Dunaway v. New York,* 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256–58, 60 L.Ed.2d 824 (1979). Given the "endless variations in the facts and circumstances," there is no "litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop" and becomes an arrest. *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983).

■ The reasonableness of an investigatory stop may be determined by examining: (1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts. In other words, the issue is whether the police conduct—given their suspicions and the surrounding circumstances—was reasonable. *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79. In the recent past, the "permissible reasons for a stop and search and the permissible scope of the intrusion [under the *Terry* doctrine] have expanded beyond their original contours." *United States v. Chaidez,* 919 F.2d at 1198. The last decade "has witnessed a multifaceted expansion of *Terry,*" including the "trend granting officers greater latitude in using force in order to 'neutralize' potentially dangerous suspects during an investigatory detention," *United States v. Perdue,* 8 F.3d 1455, 1464 (10th Cir.1993). For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other

measures of force more traditionally associated with arrest than with investigatory detention.

### A. Proper Basis for the Stop

█ With respect to the case before us and the requirement for specific and articulable facts, we must assess the totality of the circumstances and the reasonable inferences that may be drawn from it. On this basis, we believe that the police justifiably held a reasonable suspicion that the car and its driver were involved in the bank robbery. While two hours had passed since the robbery and the car was spotted 50 miles west of Eau Claire, these temporal and geographic gaps were not enough to dispel the reasonable suspicion based on the exact match of a unique automobile with a driver fitting the general description of the bank robber. *See United States v. Chapman,* 954 F.2d at 1357 (police stopped vehicle closely matching the description of bank robbery getaway vehicle; however, propriety of stop not at issue); *United States v. Harrington,* 923 F.2d 1371, 1373 (9th Cir.) (reasonable stop of defendant matching general physical description of bank robbery suspect, notwithstanding fact that an hour and ten minutes had passed since suspect last seen by witnesses), *cert. denied,* —— U.S. ——, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991); *Creighton v. Anderson,* 922 F.2d 443, 450 (8th Cir.1990) (reasonable to stop car even though description of getaway car was somewhat different than that of defendant's car); *Thomas v. Newsome,* 821 F.2d 1550, 1553 & n. 3 (11th Cir.) (reasonable suspicion to perform *Terry* stop even though, when officer saw blue Pinto driven by a black male as described in police bulletin, seven hours had passed since motel robbery), *cert. denied,* 484 U.S. 967, 108 S.Ct. 461, 98 L.Ed.2d 401 (1987); *United States v. Longmire,* 761 F.2d 411, 419–20 (7th Cir.1985) (four hours after receiving radio dispatch closely matching description of car under surveillance, automobile was stopped and searched for weapons, and reasonable suspicion was not dispelled by fact that dispatch indicated nothing more than the race of the two black females, and failed to indicate that the women were armed). *Cf. United States v. Wilson,* 2 F.3d at 227 (denial of motion to suppress affirmed; police stopped brown station wagon 30 seconds after radio broadcast); *United States v. Maguire,* 918 F.2d 254, 258 (1st Cir.1990) (probable cause to arrest existed where there was a "tightly forged chain of circumstances," when police officer sighted four fleeing bank robbers just two minutes after police radio dispatch, followed them and arrested them within 17 minutes of first hearing of the robbery), *cert. denied,* 499 U.S. 950, 111 S.Ct. 1421, 113 L.Ed.2d 474 (1991).

### B. Degree of Intrusiveness/Show of Force

█ With respect to the degree of intrusion and its relation to the law enforcement problem at hand, we believe the police action here was reasonable. The police should, of course, use the least intrusive means reasonably available to verify or dispel their suspicions in a short period of time. *Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. Nevertheless, the fact that "the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973). *See also United States v. Ocampo,* 890 F.2d 1363, 1369–70 (7th Cir. 1989) (the fact that police officer might have effectuated the stop safely without drawing his gun did not render the stop unreasonable). When effecting a *Terry* stop, which is always a stop made at "close range," police officers must make a quick decision about how to protect themselves and others from possible danger. They are not necessarily required to "adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Michigan v. Long,* 463 U.S. 1032, 1052, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201 (1983); *United States v. Boden,* 854 F.2d 983, 994 (7th Cir. 1988). A court in its assessment "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

This circuit has adopted a sliding scale approach to the problem. Thus, "[s]tops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of restraint." *United States v. Chaidez*, 919 F.2d at 1198.[1] Officers faced with a "fluid situation ... are permitted to graduate their responses to the demands of the particular circumstances confronting them." *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir.1993).[2]

Although the car stop itself was certainly proper, Tilmon's car was completely surrounded by police vehicles when he was asked to get out. *See, e.g., United States v. Randall*, 947 F.2d 1314, 1318 (7th Cir.1991) (in dicta court states that it did not exceed permissible limits of *Terry* stop when three police vehicles converged on and stopped suspect's car where his car matched description in radio dispatch of car leaving bank and suspect matched description of one who appeared to be about to help person who was being arrested at the bank); *United States v. Humberto Lechuga*, 994 F.2d 346 (7th Cir.) (en banc) (blocking car was proper where police concerned that suspect might seek to evade a vehicle stop by escaping at high speed, thereby risking danger to the police, unwary motorists or pedestrians), *cert. denied*, —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993); *United States v. Jones*, 759 F.2d 633, 638 (8th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985) (blocking proper because suspect might flee upon approach of police with resulting danger to the public as well as to the officers).

Tilmon complains that he was terrified when he saw that all the officers had drawn their weapons prior to his leaving the car, and he argues that the drawn weapons transformed the stop into an arrest. But it is not surprising that "[i]nvestigative detentions involving suspects in vehicles are fraught with danger to police officers." *Michigan v. Long*, 463 U.S. at 1047, 103 S.Ct. at 3480. The officers here performed a "felony stop," a form of detention employed when the person in a suspect vehicle is considered armed or otherwise a hazard to the detaining officers.

 The mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety. *United States v. Greene*, 783 F.2d 1364, 1367–68 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986). "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*." *United States v. Maslanka*, 501 F.2d 208, 213 n. 10 (5th Cir.1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (citation omitted). *See e.g., United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985) (police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn, a vehicle they had stopped); *United States v. Serna–Barreto*, 842 F.2d at 968 (officers' drawing guns did not automatically escalate investigatory stop into an arrest where officers' safety required such a measure). *Cf. United States v. Novak*, 870 F.2d 1345 (7th Cir.1989) (*Terry* stop in an airport became an arrest; one officer pointed her gun at suspect as six to nine officers stopped the two defendants, who were not believed to be armed or dangerous and were not in a car and offered no resistance). As we explained in *Serna–Barreto*:

---

1. *See also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (inquiry as to propriety of *Terry* stop focuses on "the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped"); *Llaguno v. Mingey*, 763 F.2d 1560, 1566 (7th Cir.1985) (en banc) (sliding-scale approach used in probable cause cases, responding to gravity of offense and need for more thorough investigation).

2. Citing: *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *United States v. Sharpe*, 470 U.S. at 685–86, 105 S.Ct. at 1575; *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir.1989); *United States v. Serna–Barreto*, 842 F.2d at 966–68.

"Although we are troubled by the thought of allowing policemen to stop people at the point of a gun when probable cause to arrest is lacking, we are unwilling to hold that an investigative stop is never lawful when it can be effectuated safely only in that manner. It is not nice to have a gun pointed at you by a policeman but it is worse to have a gun pointed at you by a criminal, so there is a complex tradeoff involved in any proposal to reduce (or increase) the permissible scope of investigatory stops. We need not decide in this case just how great that scope should be, though clearly we are near the outer edge." *United States v. Serna–Barreto,* 842 F.2d at 968.

In the case before us, the officers had been told by radio dispatch that the bank robber was armed and dangerous. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883. Tilmon had allegedly threatened to blow up the bank and the people in the bank with a "bomb," which was left on the bank premises. Allowing police to draw their weapons may be reasonable if the "suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is commonplace." *United States v. Aurelio Lechuga,* 925 F.2d 1035, 1040 (7th Cir.1991). Certainly a bank robbery, particularly one where the robber threatened to blow up the bank with a bomb, is a crime where the use of weapons is commonplace. *United States v. Alvarez,* 899 F.2d 833, 838–39 (9th Cir.1990) (drawing guns and ordering defendant to leave a car did not transform investigatory stop into arrest where police believed that suspected bank robber might be carrying explosives),

cert. denied, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991); *United States v. Doffin,* 791 F.2d 118, 120 (8th Cir.) (*Terry* stop of car driven by suspects in armed bank robbery was not transformed into an arrest when officers pointed shotgun at driver), *cert. denied,* 479 U.S. 861, 107 S.Ct. 210, 93 L.Ed.2d 140 (1986); *United States v. Jackson,* 652 F.2d 244, 249 (2d Cir.1981) (reasonable for police officer to draw gun when he approaches a car whose driver may be an escaping armed bank robber; "[a]n officer approaching a suspected bank robber could reasonably infer from the nature of the crime that the suspect may well be armed and dangerous"), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *United States v. Coades,* 549 F.2d 1303, 1305 (9th Cir.1977) (drawing of guns did not transform stop into arrest in view of officers' information that the two suspects were armed and fleeing an attempted bank robbery in which shots were fired); *United States v. Diggs,* 522 F.2d 1310, 1314 (D.C.Cir.1975) (approach with guns drawn to car occupied by three suspected bank robbers involved reasonable precaution), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976). *See also United States v. Ocampo,* 890 F.2d at 1369 (*Terry* stop where officers had guns drawn was justified where it is "beyond dispute that drug traffickers are often armed and dangerous").

At least up to the point where the officers required Tilmon to lie on the ground and then handcuffed him, the situation still fitted the framework of an investigatory stop.

It is permissible in some *Terry* stops to require a suspect to leave a car [3] and it may even be acceptable to make him lie prone on the ground without transforming an investigatory stop into an arrest. *See, e.g., United States v. Jacobs,* 715 F.2d 1343, 1346 (9th Cir.1983). "Admittedly, being held at gun-

---

**3.** *See New York v. Class,* 475 U.S. 106, 116, 106 S.Ct. 960, 967, 89 L.Ed.2d 81 (1986) (in *Terry* stop, officer may "require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon"); *Pennsylvania v. Mimms,* 434 U.S. at 111 & n. 6, 98 S.Ct. at 333 & n. 6 (after making a valid *Terry* stop, asking a driver to get out of the vehicle is only a *de*

*minimis* intrusion, a mere inconvenience, since the "driver is being asked to expose to view very little more of his person than is already exposed"). Often the justification for the officer's request is the fact that when a suspect is seated in a car, the police do not have him in full view. *Lechuga,* 925 F.2d at 1040; *Ocampo,* 890 F.2d at 1369; *Serna–Barreto,* 842 F.2d at 968.

point by the police would be a powerful incentive for most persons neither to flee nor resist an impending investigation. Such a situation is not, however, equally inspirational for everyone." *United States v. Sanders,* 994 F.2d 200, 207 (5th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 408, 126 L.Ed.2d 355 (1993). When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons. *See Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991) (requiring suspects to lie on the ground was an "additional method" that the officer used "in conjunction with his drawn gun" to subdue suspects after making *Terry* stop). Thus, a "lying prone" requirement may be within the scope of an investigative detention. Relying only on the guns trained upon a suspect may not, in certain circumstances, ensure the officers' safety or the safety of innocent bystanders. *Sanders,* 994 F.2d at 208. *See also Perdue,* 8 F.3d at 1463 (noting "recent trend allowing police to use handcuffs or place suspects on the ground during a *Terry* stop") (collecting cases); *United States v. Smith,* 3 F.3d 1088 (7th Cir.1993) (handcuffs), *cert. denied,* — U.S. —, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994). Neither does handcuffing in all circumstances transform a stop into an arrest.[4] In fact, handcuffing—once highly problematic—is becoming quite acceptable in the context of a *Terry* analysis. In addition, it is not necessarily improper to detain suspects in a police car during some kinds of investigatory stops. *See, e.g., Pliska v. City of Stevens Point,* 823 F.2d 1168, 1176–78 (7th Cir.1987) (suspect placed in police squad car during investigation); *Thomas v. Newsome,* 821 F.2d at 1554.

In summary, the police were justified in stopping Tilmon's car to get a closer look at the driver to see if he fitted the description of the bank robber. In these circumstances they were justified in making a show of force to protect themselves and passersby when the suspect was considered armed and dangerous. The stop was reasonable in scope and therefore not tantamount to an arrest.

## III. PROBABLE CAUSE TO ARREST

■ In any event, after Tilmon stepped out of the car and the officers could compare him with the robber's description, there was probable cause for his arrest. *See United States v. Danielson,* 728 F.2d 1143, 1147–48 (8th Cir.) (investigatory stop developed into probable cause to arrest where, three miles from and 30 minutes after bank robbery, police stopped vehicle matching description of getaway car, and when flashing lights were turned on, second person sat up in car, two males having robbed bank; "sudden and suspicious appearance of the second suspect" raised reasonable suspicion to probable cause), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). Probable cause to arrest exists when a reasonably cautious and prudent person would be justified in believing that the individual to be arrested had committed, was committing or was about to commit a crime. *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963).

At the moment Tilmon left his car, the police were immediately aware that he matched the description given on the police radio. He is a young, black male of medium complexion and of medium build and height. This was enough in connection with identification of the distinctively marked car to establish probable cause to arrest. *See United States v. Chapman,* 954 F.2d at 1357 (officers' suspicion rose to level of probable cause when they stopped truck matching description of bank robbery getaway vehicle, and they discovered two men hiding in rear of truck along with a duffel bag, a holster and a ski mask). Admittedly, he wore different clothes from those described by the robbery eyewitnesses but two hours had passed since the robbery. *See United States v. Jackson,*

---

4. With respect to the use of handcuffs, *see United States v. Wilson,* 2 F.3d at 231 (upholding use of handcuffs in investigatory stop); *Tom v. Voida,* 963 F.2d 952, 957–958 (7th Cir.1992) (upholding use of handcuffs in investigatory stop); *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir. 1989) (handcuffing was permissible as part of a *Terry* stop where police dispatch indicated defendants were in possession of several small weapons and an explosive device, and a loaded clip was found on the defendant).

652 F.2d 244 at 248–49 (reasonable suspicion to stop suspected bank robber where age, race, hairstyle and coat color matched description of robber, despite the fact that he was not wearing the exact clothing described by eyewitnesses).

## IV. SUFFICIENCY OF EVIDENCE

■ Tilmon also contends that the government failed to prove him guilty beyond a reasonable doubt. But a verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury can find guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Villagrana,* 5 F.3d 1048 (7th Cir.1993). Of course, we review the evidence in a light most favorable to the government. *Id.*

All the evidence supporting Tilmon's conviction is circumstantial, since no one at the robbery scene was able to identify Tilmon as the bank robber, no one could identify him from the photographs taken by the video camera at the bank and the money taken from the bank was never found. However, the descriptions given by the bank employees fitted Tilmon well. At trial, Cheryl Rosemeyer, a bank teller, testified that a black male had approached her and announced a robbery.[5] He wore a sweatshirt with its hood up, some type of black mesh netting over his face and no gloves. He carried a purple duffel bag and a box that he "referred to as a bomb, and it had some type of glass plate or plastic plate that was clear, and it had some type of light behind it." The robber was 5′9″ or 5′10″ tall and in his twenties, wearing a gray or beige hooded sweatshirt with a dark stripe across the middle. The robber demanded large bills and "indicated that if he found any small bills, he would be back to blow the place up." When he left the bank,

he ran towards Highway 37. (The bank is located at the intersection of Highway 37 and Hamilton Avenue.)

Paul Kohler, the manager of the bank, testified in a similar vein. He added that, when he moved to set off an alarm, the robber said: "Don't do it man." Kohler continued,

> "He started to pull a box out of a bag and said, 'I have got a bomb. Get away from your desk. Stand up, or I will blow this place up.' "

Kohler is 5′10″ tall, and when he stood next to the robber, the robber's eyes were level with his own. The robber appeared to be in his mid–20's, weighed approximately 165 pounds and wore black Converse tennis shoes, black sweatpants with a red and white stripe on the side and a "darker sweatshirt." Tilmon's ex-girlfriend, Lisa Braatz, later testified that she and Tilmon had bought black Converse tennis shoes for him and that he owned a beige sweatshirt with a dark stripe in the middle. Several witnesses testified that at his job, Tilmon was required to wear the type of dark sweatpants with red and white stripes on the side that Kohler had described. Braatz testified that Tilmon wore a size 8 or 9 shoe.[6] Braatz accompanied FBI Agent Southworth to the shoe store where she and Tilmon had shopped, and she immediately identified the type of shoe Tilmon had bought, a Converse.[7] Braatz also identified the type of box the shoes came in, which was the same type as the "bomb box" left at the bank by the robber. (The "bomb box" was marked size 8½.)[8] An FBI agent also testified that, several days after the bank robbery, he visited Tilmon at work and saw him wearing black Converse shoes.

The jury could also reasonably rely on considerable evidence placing a car matching the description of Tilmon's unique custom-

5. Rosemeyer testified that she had been trained to observe a robber closely, starting from his head and working down.

6. The "bomb box" (*i.e.,* the Converse shoe box) had "size 9" on its label. Tilmon testified that he wore an 8½ and had never bought size 9 shoes.

7. Sales personnel from that store testified that on the day indicated by Braatz, a size 9 pair of

Converse shoes was sold to a couple of mixed race. (Braatz is white; defendant is black.)

8. The jury was not required to ignore this evidence and accept evidence from various friends of Tilmon that he had never worn anything but Adidas shoes, and that he had never bought Converse shoes.

painted car on the shoulder of Highway 37 immediately adjacent to the bank. Five prosecution witnesses testified that shortly before the bank robbery they had observed a parked car matching the description of Tilmon's car.[9] They also testified that a man matching Tilmon's description [10] was walking on the shoulder of Highway 37 (away from the car) just around the corner from the bank. Four of the witnesses identified a photograph of Tilmon's car at trial as the car they had seen parked on the highway.[11]

Four witnesses who observed the car testified for the defense but their testimony did not dictate a different result. Their testimony was sketchy, they did not corroborate each other and they sometimes included details corroborating the prosecution's witnesses. One defense witness said the car was mid-size; another said it was large.[12] In addition, a friend of Tilmon and Braatz, Jill Hagen, placed Tilmon in Eau Claire on the day of the robbery at about 11:50 a.m. She said Tilmon drove within 30 feet of her. On the other hand, Tilmon had told the police and testified at trial that he never entered the city of Eau Claire on the day of the bank robbery.

The jury also may have found it persuasive that, at the police station, Tilmon's answers were evasive, and he admitted at trial that he lied. He was unable to tell the police where he had been on the morning of the bank robbery, where he worked or why he was dressed in a security guard uniform. Tilmon then told the police that he had been in Menomonie, Wisconsin all morning to visit a friend named Nimsey. He could not remember where Nimsey lived, but knew he lived above a bar. He said that he and Nimsey had barhopped all morning, but he did not know any of the bars that they had visited. Tilmon said he had worn black tennis shoes and a security guard's uniform when he was barhopping. He told the police he worked for American Security Company but did not know its address, the name of his supervisor or the phone number there. He denied being in Eau Claire at all that day. At trial, Tilmon admitted that he had lied to the police. He said that when he was picked up by the police, he lied to them about what he had been doing on the day of the robbery because he was scared that he would be in trouble for wearing the security officer shirt. He knew that he should not wear the uniform in Minnesota, but he thought it would be all right to wear it in Wisconsin. He lied when he told the police he still worked for American Security; he lied when he said he had been visiting a friend named Nimsey Smith all morning.

"I lied about everything. * * * I wasn't too worried about the armed robbery, because I knew I didn't do it. I was worried mostly about the uniform. * * * I was really shaken. I lied a lot."

In addition, forensic evidence analyzing the photographs from the bank video camera indicated that the robber was about 5′10″ with his shoes on and the hood up on the sweatshirt; in bare feet he would probably

---

9. They all described a two-door Mustang, painted blue with a silver or grey stripe. Four witnesses noted the Minnesota license plates on the car. In addition, two witnesses noticed the type of wheels on the car, and one witness noted the tinted windows. One witness also identified the car as a 1988 or 1989 model (it was actually a 1988 Mustang).

10. The witnesses all saw a man walking away from the parked car, in the direction of the bank. All five witnesses saw him carrying a purple or dark bag. The sweatshirt the man wore was variously described as grey, beige, medium to dark green and dark. Four witnesses noted that the man wore his hood up. Three witnesses identified the man as a black male. One witness thought he was about 5′10″ tall and weighed 175 to 180. Another witness thought he was 6′ tall and in his mid–20's.

11. One witness said he was 95% sure, and another said it was "possibly" the same car. Two witnesses were sure it was the same car.

12. One defense witness said the hood of the car was up; yet no other defense or prosecution witness testified to that fact. One witness testified there were two people in the car; while others testified that there was only one man in or near the car. One witness thought the man he saw was 6′ to 6′2″. One witness thought the car was grey; another thought it was bluish-grey and a third identified the custom paint job with blue-grey stripes. Only one defense witness noticed the Minnesota plates and tinted windows.

measure 5'8". Tilmon was actually 5'7¾" tall.[13]

Finally, the jury could reasonably have found that Tilmon's testimony lacked credibility. As noted, Tilmon testified at trial that he did not rob the bank and denied ever having been in Eau Claire on June 18, 1992. He also testified that at about 10:40 a.m. he left Minnesota and drove to Menomonie, where he intended to look for extra jobs as a weekend security guard or as a bouncer for parties. He wore his American Security uniform, which he had obtained in a previous job as a security guard, but he did not plan to tell prospective employers that he had worked at American Security, and instead would say "this is my own private company. They probably wouldn't know anyway." He had previously worked at a number of security jobs for colleges, fraternity parties or weddings. He said that he arrived in Menomonie at about 11:20 a.m. and asked a person on the street where the fraternity houses were. He then went to one house, but no one was at home, and he could not recall the name of the street, the name of the fraternity or what the house looked like. He did not go to any of the other fraternity houses because he did not see many people around, probably because "school was out or summer school, or I don't know." He did not speak to anyone in Menomonie that day about a job. After an hour driving around Menomonie, he went to McDonald's for half an hour and started to drive home to Minnesota, when he was stopped by the police. Tilmon denied having unusual financial difficulties and denied that he was in need of extra money. He admitted, however, that he sometimes paid the rent late, and that he had failed to buy car insurance, as required by his automobile installment agreement.

Viewing this evidence in a light most favorable to the government, there is sufficient evidence from which the jury could find guilt beyond a reasonable doubt.

## V. JURY INSTRUCTION ON DEFINITION OF REASONABLE DOUBT

 Finally, Tilmon argues that the district court erred in refusing to instruct the jury on a definition of reasonable doubt. There was no abuse of discretion in refusing to give such an instruction. "An attempt to define reasonable doubt presents a risk without any real benefit." *United States v. Hanson*, 994 F.2d 403, 408 (7th Cir.1993), quoting *United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir.1988). *See also United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir.) (listing Seventh Circuit cases offering admonition that district court should not try to define reasonable doubt), *cert. denied*, —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993).

Accordingly, for these reasons the decision of the district court is AFFIRMED.

13. Forensic evidence also indicated that, while the bank robber touched surfaces that should have left fingerprints, there were no fingerprints to be found on those surfaces. Expert witnesses concluded that the robber had somehow masked his fingerprints. While several fingerprints were found on the "bomb box," none of the fingerprints belonged to Tilmon.