In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-2128 & 11-2398

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CORLEY SMITH and KIM EVANS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 152—**Amy J. St. Eve**, *Judge.*

ARGUED APRIL 20, 2012—DECIDED OCTOBER 4, 2012

Before EASTERBROOK, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Corley Smith and Kim Evans were both convicted of one count of bank robbery and one count of possession of a firearm in furtherance of a crime of violence. Evans was also convicted of being a felon in possession of a firearm. Smith and Evans appeal from the denial of their motion to suppress evidence seized following the bank robbery and also present several challenges to evidentiary rulings and the jury instructions. Smith also appeals his sentence. We affirm.

**I.**

Corley Smith, Kim Evans, and Dezmond Swanson were indicted by a grand jury and all charged with one count of bank robbery and one count of using a firearm in furtherance of a crime of violence. Evans was also charged with being a felon in possession of a firearm. Evans and Smith pleaded not guilty. Swanson pleaded guilty and agreed to cooperate.

As part of his agreement to cooperate, Swanson testified at the trial of Evans and Smith. Swanson testified that in the afternoon of February 20, 2009, Evans approached him near 73rd and May Streets in Chicago and asked Swanson if he wanted to make some money. Swanson agreed and then the duo got into a green Cadillac which Evans was driving. Smith was already in the front passenger seat. Evans told Swanson that they were going to rob a bank and told Swanson to "stand guard" while they got the money.

About 4:00 p.m., the three arrived at the Fifth Third Bank in Evanston; they put on gloves and masks and entered the bank. Evans entered first with a gun drawn and vaulted over the teller counter. Smith also vaulted over the counter, leaving a shoe print on a piece of paper as he did so. Swanson stood guard near the door. During the robbery, Evans and Smith yelled at the bank employees with one of them saying repeatedly "someone's gonna die today." No one was killed, but Evans struck a teller named Stoyan Popov in the head with the butt of the gun. Evans and Smith stuffed the money into the bag Evans was carrying and left the

bank. After the threesome fled, a dye pack hidden inside some of the money exploded and the money-bag started to smoke. Evans threw the bag with the money on the ground in an alley and they then fled in the green Cadillac, returning to 73rd and May Streets. En route, Evans stopped and put the gun into the trunk of the car.

Unbeknownst to the robbers, FBI agents were conducting surveillance in the area of 73rd and May and prior to the robbery had been following the green Cadillac; the officers had lost sight of the Cadillac around 2:15 p.m. The FBI had been watching the Cadillac because on February 16, 2009, two Chicago suburban banks had been robbed and in the early morning of February 20, 2009, an informant had told the FBI that the perpetrators of the February 16th robberies intended to rob a bank later that day. The FBI agent who received this information had worked with the informant in the past and the informant had proven reliable.

Based on the informant's statements, the FBI had held a briefing at 10:00 a.m. on February 20, 2009. FBI Agents Bacha, Heidenreich, and Stover, along with other FBI agents and Task Force officers, attended. At the briefing, they were told that a black male named "Kim" was the leader of a group involved in the February 16th bank robberies and that some of the other robbers resided in the area of 73rd and May Streets in Chicago. After this initial briefing, additional details from the informant were relayed to law enforcement officers. Specifically, the officers learned that Kim, who was on

home confinement, had recently cut off his electronic monitoring bracelet; that two males involved with Kim in the earlier bank robberies were standing on the street near 73rd and May; and that Kim soon would be arriving there in a green Cadillac to pick them up and rob another bank.

By 11:30 a.m., Agents Bacha and Stover, as well as several other agents, were in vehicles surveilling the 7300 block of May. Around noon, Agents Bacha and Stover observed a two-door green Cadillac in the area of 73rd and May. Over the next two hours, Agents Bacha and Stover observed the Cadillac traveling to various locations in the area of 73rd and May, with several individuals getting into and out of the Cadillac.

Around 2:15 p.m., law enforcement agents lost sight of the Cadillac and were unable to locate it in the vicinity of 73rd and May. Then between 4:15 and 4:30 p.m., Agents Bacha and Stover—who had remained in the area of 73rd and May looking for the green Cadillac—received information that the Evanston Fifth Third bank had been robbed at about 4:00 p.m. by three black males. Based on their familiarity with the Chicago area, the agents knew that it would be possible for a vehicle to travel from the area where the green Cadillac had last been seen at 2:15 p.m. to Evanston, Illinois, within about an hour and a half.

Just before 5:00 p.m., Agents Stover and Heidenreich each received an email from another FBI agent regarding the Fifth Third robbery. The email included "Update #3" which stated: "per bank staff identification" there were at least three black male suspects, all five feet, nine

inches tall, and thin. This update also provided a description of the clothing worn by the robbers, including that one robber was wearing black jeans, black shoes, a green sleeveless jacket, a black hoodie, and black gloves. The email further advised: "All subjects considered armed and dangerous."

At about 6:00 p.m., surveillance agents saw the green Cadillac return to the area of 73rd and May. The agents saw a man, later identified as Evans, pull the Cadillac into a street parking spot and stop. Another man, later determined to be Smith, got out. Surveillance agents then approached and identified themselves as law enforcement agents, calling "police," prompting Evans to drive off at a high speed with Swanson still in the car. In fleeing, Evans collided into an oncoming FBI vehicle with its police lights activated. Evans then got out of the crashed Cadillac and fled. He was later apprehended; Swanson was apprehended at the scene of the crash. After confirming that the individuals in the Cadillac matched the perpetrators' descriptions and attire, officers searched the Cadillac. They recovered a gun similar to the one used in the robbery, as well as clothing, black face masks, black stocking hats, and multiple sets of gloves. The car, which was rendered immobile from the crash, was towed and later subjected to an inventory search.

Meanwhile, as the other agents pursued Evans and Swanson, Agent Stover handcuffed Smith at the location where he had gotten out of the Cadillac. Agent Stover patted Smith down and held him for ten minutes until another agent arrived with photographs of the robbers.

Smith's attire matched one of the robbers' clothing
(as captured in the photographs) perfectly and Agent
Stover arrested him. Either during the frisk, or later
during a full-blown search pursuant to the arrest—it is
unclear which from the record—Agent Stover recovered
from Smith's person a pair of black gloves and a Velcro
face mask.

Prior to trial, Smith moved to suppress the evidence
seized from his person, arguing that his arrest was unconsti-
tutional. Additionally, Evans and Smith sought to
suppress the evidence seized during the search of the
green Cadillac. The district court denied those motions,
so the jury heard the above evidence. Smith also sought
to suppress expert testimony identifying the footprint on
the teller's counter as belonging to the shoes he was
wearing at the time of his arrest. The district court
also denied that motion and allowed FBI Forensic Examiner
Michael Smith to testify. FBI Examiner Smith first
testified about his methodology for examining shoe
prints. He then testified about his comparison of
the footwear impressions collected at various locations
from the bank with the shoes Smith was wearing at the
time of his arrest. FBI Examiner Smith concluded that
the left Nike shoe worn by defendant Smith at the time
of his arrest had made the partial impression on the piece
of paper recovered from the tellers' counter at the bank.
He further testified that the impressions left on the
bank carpet either corresponded in physical size and design
or shared similar design features with the left and right
Nike shoes worn by Smith at the time of his arrest.

Based on the above testimony and evidence, a jury convicted the defendants on all counts. The district court sentenced Smith to a total of 162 months' imprisonment and Evans to a total of 444 months' imprisonment. Smith and Evans appeal.

## II.

On appeal, Smith and Evans argue that the district court erred in denying their motion to suppress evidence seized during a search of the green Cadillac. Smith presents several additional arguments on appeal related solely to him. Specifically, Smith asserts that the district court erroneously denied his motion to suppress evidence seized when officers searched him. Next, he argues that the district court erred in admitting FBI Examiner Michael Smith's testimony concerning the footprint impressions. Smith further challenges the sufficiency of the evidence related to his conviction for using a firearm in connection with a crime of violence. Finally, Smith challenges his sentence, arguing that the district court erred in enhancing his advisory guideline range for making a death threat and for causing bodily injury. Appellant Evans presents one additional argument in his appeal: He claims that the district court abused its discretion and committed reversible error by providing an aiding and abetting instruction and a *Pinkerton* instruction related to the government's case against him. We consider each issue in turn.

### A.  Search of the green Cadillac

On appeal, both Smith and Evans argue that the district court erred in denying their motion to suppress evidence seized during the search of the green Cadillac, asserting that the officers lacked probable cause to search the car. Smith, though, was a mere passenger in the car and there is absolutely no evidence indicating that he had any ownership interest in the car. And there is no other basis to conclude that he had a reasonable expectation of privacy in the car. Accordingly, Smith's Fourth Amendment rights were not violated and the district court properly denied his motion to suppress the evidence seized from the Cadillac. *See United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001).

Evans's challenge to the motion to suppress evidence seized from the Cadillac also fails. The Supreme Court held in *Arizona v. Gant*, 556 U.S. 332, 351 (2009), that the "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." In this case, the agents arrested Evans and Swanson for bank robbery and they had every reason to believe there was evidence of the offense in the green Cadillac. The bank robbery had just occurred and when officers approached the vehicle, Evans sped off, striking another agent's automobile. He then attempted to flee. The arresting officers were notified in Update #3 about the armed bank robbery,

about the description of the three perpetrators, and that the robbers were to be considered armed and dangerous. Under these circumstances, it was entirely reasonable for the officers to believe that the gun and other evidence of the offense was in the green Cadillac. Accordingly, it was permissible for the officers to search the Cadillac.

Moreover, after crashing the Cadillac, the car was damaged too extensively to be driven and it was partially obstructing the street. Thus, it had to be towed. In the latter part of April 2009, the FBI conducted an inventory search of the Cadillac. Had the Cadillac not been searched earlier, i.e., at the time of Evans's arrest, the inventory search—which is perfectly constitutional, *see United States v. Clinton*, 591 F.3d 968, 972 (7th Cir. 2010)—would have uncovered the evidence of the crime. Thus, the evidence seized during the search of the Cadillac following the robbery would have been inevitably discovered and was admissible for that reason alone. *See United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010); *United States v. Simms*, 626 F.3d 966, 971 (7th Cir. 2010). For these reasons, we conclude that the district court properly denied the motion to suppress the evidence seized from the green Cadillac and properly admitted as evidence the gun, black face masks, black stocking hats, and multiple sets of gloves recovered from the car.

### B. Arrest and search of Smith

As noted above, following the robbery, the Cadillac returned to the area of 73rd and May Streets. After

Evans pulled the Cadillac into a street parking spot and stopped, Smith exited the vehicle. To calls of "police," Evans sped off, followed by FBI agents. A solo FBI agent, Agent Stover, remained at the scene; he handcuffed Smith and patted him down. Agent Stover held Smith for ten minutes until another agent arrived with photographs of the robbers. According to Agent Stover, after noting that Smith's attire matched one of the robbers perfectly, he then arrested Smith. A search of Smith (either the initial frisk or a later search when Agent Stover arrested him—it is unclear from the record which one) uncovered a pair of black gloves and a Velcro face mask. Smith moved to suppress this evidence, but the district court denied the motion to suppress. The district court held that the FBI's initial encounter with Smith (after he exited the green Cadillac) was an investigatory detention supported by reasonable suspicion and that it was not until ten minutes later, after another officer arrived with photographs of the robbers, which showed one robber wearing the same clothing as Smith, that Smith was arrested. Because the initial stop was supported by reasonable suspicion and the later arrest was supported by probable cause, the district court denied the motion to suppress the evidence.

On appeal, Smith argues that his initial encounter with Agent Stover was an arrest and that because the government lacked probable cause to arrest him at that time, the evidence seized was inadmissible. Conversely, the government maintains that Agent Stover's initial encounter with Smith was an investigative detention, i.e., a *Terry* stop, which required only reasonable suspicion,

and that Smith was arrested only after the agents received photographs of the robbers, which matched Smith's attire.

We agree with the government. "A *Terry* investigative stop is 'a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011) (internal quotations omitted). "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). And "[t]he reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual as well as on the reason for the restraint." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994).

In this case, Agent Stover detained Smith briefly while other agents pursued the fleeing suspects in the Cadillac. Then, within ten minutes, an agent returned bringing with him photographs of the robbers from the bank surveillance video. These photographs allowed the agents to confirm their suspicions and to verify that Smith's appearance matched one of the robbers. Based on these facts, we agree with the district court that Agent Stover's initial encounter with Smith was a *Terry* investigative stop and not an arrest.

Smith attempts to negate this conclusion by noting that Agent Stover had drawn his weapon when approaching the Cadillac and by stressing that Agent Stover had handcuffed him immediately. Agent Stover, though, testified that while he initially drew his gun, he then re-holstered it because he believed Smith might flee and he did not want to chase him with a gun drawn.[1] In any event, officers conducting an investigatory stop may approach with guns drawn and may handcuff a suspect without transforming an investigatory stop into an arrest. *Tilmon* 19 F.3d at 1228. And in this case, it was entirely reasonable for officers to approach the Cadillac with guns drawn because they had been directed to consider the bank robbers "armed and dangerous" and because they knew the bank robbery had involved a gun. Similarly, it was entirely reasonable for Agent Stover to use handcuffs to securely detain Smith during the brief ten minutes when Agent Stover was left alone

---

[1] Smith also argues that he was forced to the ground based on Swanson's trial testimony that he heard law enforcement officers scream "get down." But there was no testimony that Smith heard this command, complied with it, or was held on the ground. And even had he been, that would not change the analysis. *See Tilmon*, 19 F.3d at 1228 (explaining that "[w]hen a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapon[, and] [t]hus a 'lying prone' requirement may be within the scope of an investigative detention").

with Smith on a public street—both to protect himself and the public at large. *Tilmon*, 19 F.3d at 1228; *Bullock*, 632 F.3d at 1011.

Smith alternatively argues that even if his initial encounter with Agent Stover was merely an investigatory detention and not an arrest, Agent Stover lacked reasonable suspicion to effectuate a *Terry* stop. *See Tilmon*, 19 F.3d at 1224 ("An investigatory stop not amounting to an arrest is authorized if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity.") (quoting *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968)). Again, we disagree. In this case, the evidence was more than sufficient to establish that Agent Stover had reasonable suspicion to effectuate a *Terry* stop following Smith's exit from the green Cadillac. First, Agent Stover knew that an informant had told an FBI agent that a bank robbery would occur that day and that the robbers would be leaving from the 73rd and May location in a green Cadillac. Agent Stover and other officers saw three black males driving in the 73rd and May vicinity that afternoon in a green Cadillac, before disappearing. And then about an hour and forty-five minutes later, a bank robbery occurred within the Chicago-land area, in a location about 90 minutes away from the last known vicinity of the green Cadillac. Prior to Smith's arrest, Agent Stover also had received "Update #3," which stated that the robbers were three black males and that one was wearing black jeans, black shoes, a green sleeveless jacket, a black hoodie, and black gloves. When Smith exited the Cadillac, he was wearing clothing very similar to that described, namely all black clothing,

including a sleeveless jacket and a black hoodie. And after Smith's departure from the Cadillac, to calls of "police," the driver sped away and crashed into another car.

The totality of these facts easily established a reasonable suspicion that Smith was involved in the bank robbery. Accordingly, Agent Stover was entitled to effectuate a *Terry* stop and pat down Smith upon Smith's exit from the Cadillac. And then when the other officer arrived with photographs confirming that Smith's appearance matched one of the robbers perfectly, Agent Stover had probable cause to arrest Smith and to conduct a search incident to arrest. Whether the evidence seized from Smith was recovered during the initial frisk or the later search pursuant to his arrest is irrelevant because it all would have been discovered inevitably. Accordingly, the district court properly denied Smith's motion to suppress the evidence seized from Smith's person and properly admitted the evidence at trial.

### C.  *Admissibility of FBI Examiner Smith's testimony*

Smith next challenges the admissibility of the expert testimony from FBI Examiner Michael Smith. Prior to trial, the government indicated its intention to introduce the testimony and conclusions of FBI Examiner Smith, who had examined footwear impressions left at the bank and the shoes worn by Smith and his co-defendants. Smith challenged the admissibility of this evidence, arguing that footwear-impression analysis was not grounded

in reliable scientific facts, data, and methodology as required by Fed. R. Evid. 702.

The district court held a hearing to determine the admissibility of FBI Examiner Smith's testimony. At that hearing, FBI Examiner Smith explained that all shoes differ and that they have features which an average layperson, without training and experience, would not be able to distinguish adequately. FBI Examiner Smith further testified concerning the four-step methodology he used to compare the footprints. He explained that he considered: (1) if there was sufficient detail in the questioned impression (i.e., the one recovered from the bank) and then he compared the design (e.g., a series of diamonds or circles) of the questioned impression on the outsole (or bottom of the shoe) with the design on the outsole of the known shoes; (2) if the design of the questioned impression and that of the known shoe were the same, he determined if the physical sizes (i.e., the outside dimensions, length, and width) and spatial relationship of the design features corresponded; (3) if the design and size were the same, he analyzed whether there were wear features in the questioned impression (e.g., portion of design elements such as a logo worn off) that were also in the known shoe; and (4) if the design and size were the same and there was wear correspondence, he looked for any identifying characteristics on the questioned impression and the known shoe, such as rocks or glass or nicks, cuts, or gouges that may appear on the bottoms of the shoes. FBI Examiner Smith added that other forensic examiners at the FBI's laboratory in Quantico,

Virginia use this precise four-step methodology, as do forensic laboratories throughout the United States, in Canada, and in thirty other countries. Additionally, FBI Examiner Smith explained there have been peer reviews of this methodology published in several books and articles and it is generally accepted in the field of footwear-impression evidence.

FBI Examiner Smith then testified that based on his examination, the left Nike shoe worn by defendant Smith at the time of the robbery made the partial impression on the piece of paper recovered from the tellers' counter at the bank and that the impressions left on the bank carpet were consistent with the shoes worn by defendant Smith at the time of his arrest. He added that another qualified footwear examiner at the FBI reviewed the same evidence and came to the same conclusion.

Following the hearing, the district court issued a written opinion carefully reviewing Smith's objections to the testimony concerning the footwear evidence. The district court ruled that the expert testimony was admissible at trial. And then at trial, FBI Examiner Smith testified similarly to the above testimony.

On appeal, Smith argues that the district court erred in admitting FBI Examiner Smith's testimony under Rule 702. The then-applicable version

of Rule 702 of the Federal Rules of Evidence,[2] which governed the admission of expert testimony, provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid 702. *See also Daubert v. Merrell Dow Pharamaceuticals, Inc.* 509 U.S. 579 (1993).

We have previously held that it is within a district court's discretion to permit expert testimony regarding footwear impressions. *United States v. Allen*, 390 F.3d 944, 949-50 (7th Cir. 2004). Several of our sister circuits agree. *See United States v. Ford*, 481 F.3d 215, 217-21 (3d Cir. 2007); *United States v. Mahone*, 453 F.3d 68, 70-73 (1st Cir. 2006); *United States v. Ross*, 263 F.3d 844, 846-47 (8th Cir. 2001); *United States v. Rodgers*, 85 Fed. Appx. 483, 487 (6th Cir. 2004).

---

[2] Judgment against defendants was entered in June 2011. Federal Rule of Evidence 702 was amended in 2011, effective December 1, 2011. Fed. R. Evid 702. The changes were merely stylistic and not intended "to change any result in any ruling on evidence admissibility." Fed. R. Evid. 702, Advisory Committee's Note.

Notwithstanding this weight of authority, Smith argues that *Allen* should be revisited because footwear-impression analysis does not meet the demands of Rule 702. We disagree and today reaffirm our holding in *Allen.* In *Allen*, we affirmed the admission of footprint analysis testimony where the expert testified that "accurate comparisons require a trained eye; the techniques for shoe-print identification are generally accepted in the forensic community; and the methodologies are subject to peer review." *Allen*, 390 F.3d at 949-50. In this case, FBI Examiner Smith testified that the four-step approach he used is used by forensic laboratories throughout the United States, in Canada, and in thirty other countries. He also explained that there have been peer reviews of the methodology he used published in several books and articles. And FBI Examiner Smith explained in detail how he applied this methodology to the footprint impressions recovered at the bank. Thus, Smith's testimony was based "upon sufficient facts," was the "product of reliable principles and methods," and his testimony established that he "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Accordingly, consistent with our holding in *Allen*, we conclude that the district court did not abuse its discretion in admitting FBI Examiner Smith's expert testimony regarding the shoe print evidence.[3]

---

[3] Smith also argues that FBI Examiner Smith's technique was fatally flawed because he did not use the four-step methodology. Smith points to FBI Examiner Smith's statement that he could positively match a shoe to a footwear impression based on "one

(continued...)

### D. *Sufficiency of the evidence for the firearm count against Smith*

Next, Smith challenges the sufficiency of the evidence supporting his conviction for using a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c). In reviewing a conviction for the sufficiency of the evidence, "we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vasquez*, 909 F.2d 235, 239 (7th Cir. 1990).

It is undisputed that Smith did not possess a gun himself during the robbery. Nonetheless, under *Pinkerton v. United States*, 328 U.S. 640 (1946), even a defendant who did not physically possess a gun, like Smith, may be found guilty of violating § 924(c) if a co-conspirator used or carried a firearm during and in relation to the conspiracy, if the evidence shows that it was reasonably foreseeable to the defendant that a member of the conspiracy would possess a gun in furtherance of the conspiracy. *United States v. McLee*, 436 F.3d 751, 758 (7th Cir. 2006). Additionally, Smith was charged in the indictment

---

[3] (...continued)
identifying characteristic." Smith, though, takes this testimony out of context. FBI Examiner Smith clearly explained the four-step process and his application of it in this case and did not base his conclusion on one identifying characteristic, but on the overall four-step methodology.

with aiding and abetting, and this serves as an independent basis for § 924(c) liability. "Proving that a defendant aided and abetted the use of a firearm [in violation of 18 U.S.C. § 924(c)] requires evidence that (1) the defendant knew, either before or during the crime, of the principal's weapon possession or use; and (2) the defendant intentionally facilitated that weapon possession or use once so informed." *United States v. Moore*, 572 F.3d 334, 341 (7th Cir. 2009).

The evidence was more than sufficient to support the jury's finding of guilt on the firearm count against Smith. First, a jury could easily conclude that it was reasonably foreseeable to Smith that Evans had a gun. While it might not be foreseeable in every bank robbery that a gun will be used, *see United States v. Atwater*, 272 F.3d 511, 512 (7th Cir. 2001), this bank robbery was a take-over robbery (as opposed to a note-passing robbery), necessitating some mechanism of obtaining control of the bank. More significantly, though, the jury saw the video of the actual robbery and could reasonably conclude based on Smith's behavior during the robbery that Smith and Evans had discussed how the robbery would happen before entering the bank. Moreover, from Smith's demeanor, a jury could further gauge whether Smith knew or foresaw that Evans was planning on using a gun during the robbery. Coupled with the bank employees' testimony that Evans had the gun drawn from the moment he entered the bank, a reasonable jury could find that Smith knew that Evans had a gun, or at a minimum that it was foreseeable that he would have one. Second, even if Smith did not foresee

Evans's possession of the firearm, he is nonetheless liable for aiding and abetting because he clearly knew "during the crime" that Evans possessed the gun and because the evidence showed that Smith intentionally facilitated the possession and use of the gun during the robbery by helping to bag up the money. This division of responsibility made it easier for Evans to possess the gun and use it during a bank robbery. *See United States v. Curry*, 538 F.3d 718, 731-32 (7th Cir. 2008). For this additional reason, Smith's conviction stands.

### E.   *Smith's sentence*

Smith's final arguments on appeal concern his sentence. Smith was sentenced to a total of 162 months' imprisonment—78 months' imprisonment on the robbery charge and a consecutive 84-month term of imprisonment on the gun charge. In sentencing Smith, the district court enhanced his base offense level by two, pursuant to U.S.S.G. § 2B3.1(b)(2)(F), because "a threat of death" had been made in furtherance of the robbery. The district court enhanced Smith's offense level another two levels, pursuant to U.S.S.G. § 2B3.1(b)(3)(A), because a teller suffered bodily injury during the robbery when Evans struck the teller in the head with the butt of the gun. Smith argues that these sentencing enhancements were inappropriate because he did not know that Evans had a gun, intended to make a threat of death, or intended to strike the teller. This court reviews for clear error the district court's application of a sentencing guideline enhancement and its finding that a co-conspirator's

act was reasonably foreseeable. *United States v. Maiden*, 606 F.3d 337, 339 (7th Cir. 2010); *United States v. Williams*, 553 F.3d 1073, 1082 (7th Cir. 2009).

The district court did not commit clear error in enhancing Smith's sentence. First, during the robbery, one of the robbers announced "Someone's gonna die today," and such a statement is a threat of death made in furtherance of the robbery. Even if it were Evans who had made this threat and not Smith, the district court could reasonably conclude that under the circumstances of this case a threat of death was foreseeable to Smith. As the district court noted at Smith's sentencing hearing in rejecting Smith's arguments, this "was not just a bank robbery where they walked up to the window and got the money and ran out. Your client was actively engaged, jumping on teller counters, yelling things, actively participating, actively getting money, jumping behind, jumping back on the teller counter." From the type of robbery involved, Smith's reaction to the brandishing of the gun (captured on video tape), and the fact that Evans had the gun displayed upon entering the bank, the district court could reasonably conclude that it was foreseeable to Smith that a threat of death would be made. For the same reasons, it was reasonably foreseeable to Smith that someone would be injured during the robbery. Accordingly, the district court did not commit clear error in enhancing Smith's sentencing level for the making of a threat of death and for the infliction of bodily injury during the course of the crime. We thus affirm Smith's sentence.

### F.  Evans's conviction

Above we discussed Evans's challenge to the search of the green Cadillac. *See supra* at 8-9. Evans presents one additional challenge to his conviction on appeal, arguing that the district court erred in instructing the jury. Specifically, at trial, the district court gave both a *Pinkerton* instruction (i.e., that defendants are liable for their co-conspirator's foreseeable actions) and an aiding and abetting instruction. Evans claims that these instructions should have been limited to the government's case against Smith because the government's evidence only supported a theory that he (Evans) was the principal. Thus, Evans asserts that there was no evidentiary basis to support a theory that he was liable as a co-conspirator under *Pinkerton* or for aiding and abetting Smith.

This court reviews the district court's decision to give specific jury instructions for an abuse of discretion. *United States v. Powell*, 652 F.3d 702, 708 (7th Cir. 2011). Any instructional error, though, is subject to the harmless error standard. *See United States v. Williams*, 493 F.3d 763, 766-67 (7th Cir. 2007). Here any possible error in failing to specify that the *Pinkerton* and aiding and abetting instructions applied only to Smith was harmless. The evidence overwhelmingly supported the jury's guilty verdict based on Evans acting as the principal. Specifically, prior to the bank robbery, agents received a tip from a confidential informant (known to be reliable) that "Kim" would be robbing a bank that day and that he would be picking up his accomplices in the vicinity

of 73rd and May Streets in a green Cadillac. Then, after the officers lost sight of the Cadillac, a bank was robbed about 90 minutes later—the approximate travel time from the last known location of the automobile to the bank. The green Cadillac then returned to the 73rd and May Street location. When approached by officers, Evans fled. Upon his arrest, he and his cohorts were wearing clothing identical to that depicted in a video tape from the bank. Evans's clothing had residue on it from the dye pack. And a search of the car and Smith's person revealed the gun and other evidence of the crimes. Given the overwhelming evidence against Evans, there was "no real danger" that the jury would convict him on the basis of aiding and abetting or *Pinkerton* instructions or that "the jury was confused or misled by the instruction[s]." *United States v. Valencia*, 907 F.2d 671, 689 (7th Cir. 1990). Accordingly, any error was harmless.

### III.

The district court did not err in denying the defendants' motion to suppress. The initial encounter with Smith was an investigative detention justified by reasonable suspicion and his later arrest was supported by probable cause. Thus, the evidence recovered from Smith's person, either during the initial frisk or later during a search pursuant to the arrest, was properly admitted. Likewise probable cause justified the search of the green Cadillac. Smith's attack on the expert testimony concerning footprint impressions also fails because the testimony satisfied

the requirements of Rule 702. Additionally, Smith's challenge to his conviction for using a firearm in connection with a crime of violence fails because there was sufficient evidence from which the jury could conclude that Smith aided and abetted Evans and that it was foreseeable to Smith that Evans would brandish a firearm. Finally, Smith's appeal of his sentence falters because the evidence was sufficient to support the district court's enhancements for making a death threat and for causing bodily injury. Appellant Evans presents one additional argument in his appeal: He claims that the district court abused its discretion and committed reversible error by providing an aiding and abetting and a *Pinkerton* instruction related to the government's case against him. Even if these instructions were erroneous, any error was harmless. For these and the foregoing reasons, we AFFIRM both Evans's and Smith's convictions and Smith's sentence.