**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Librado TREVINO, also known as David Ortiz, Defendant–Appellant.**

**No. 94–2651.**

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1995.

Decided July 17, 1995.

Rehearing Denied Aug. 16, 1995.

K. Tate Chambers, Asst. U.S. Atty. (argued), Gerard A. Brost, Office of the U.S. Atty., Peoria, IL, for plaintiff-appellee.

Carey J. Luckman (argued), Pontiac, IL, for defendant-appellant.

Before MANION and ROVNER, Circuit Judges, and WILL, District Judge.*

* Hon. Hubert L. Will, of the Northern District of Illinois, sitting by designation.

MANION, Circuit Judge.

Librado Trevino was convicted on one count of distribution of cocaine and one count of distribution of marijuana, both in violation of 18 U.S.C. § 841(a)(1). In this direct appeal, Trevino challenges the district court's denial of his motion to suppress evidence gathered from what he characterizes as an unconstitutional checkpoint stop. He also challenges the effectiveness of trial counsel. We find no merit in either challenge and therefore affirm the district court's judgment.

## I.

Officers of the Peoria Police Department set up checkpoint stops at selected sites located in Peoria, Illinois. According to police guidelines, all vehicles passing through these checkpoints would be stopped. The officers conducting the stop would check each vehicle for equipment violations; they also checked each driver for various driving violations, including no proof of insurance, lack of a driver's license and revoked or suspended licenses. The officers were not to randomly stop some motorists but instead were to stop each and every approaching motorist and require him or her to pass through the checkpoint.

On September 10, 1993, Peoria Police officers were conducting a traffic safety check on all cars passing through a certain point on Forest Hills Road in Peoria, Illinois. The officers conducting the checkpoint stop were in uniform and their squad cars were pulled off the road onto the grass. When cars approached the officers would hold up their hands indicating to motorists that they were required to stop. Because this checkpoint was conducted on a lightly-traveled road, the longest backup at any time was only four to five vehicles, with an average wait of approximately three to five minutes for each car.

When it grew dark the officers signalled to incoming motorists with their flashlights. It was at this time that Trevino came upon the checkpoint. Trevino stopped his car approximately fifty feet from the checkpoint area and pulled his car along the road's shoulder. One of the officers conducting the stop, Officer King, noticed Trevino's behavior which he thought unusual. King approached Trevino's vehicle, motioning with his flashlight to pull the vehicle forward. When Trevino pulled up, Officer King asked him whether he had a driver's license, to which Trevino replied "no." Trevino did hand King a state of Illinois identification card naming him as David Ortiz. King requested proof of insurance, to which Trevino replied that he had none and that he was merely test-driving the car for the purpose of possibly purchasing it. King placed Trevino under arrest for driving without a license and proof of insurance.

Pursuant to the City of Peoria's standard rules and procedures, Trevino's car was subjected to a pre-tow inventory search. The officer conducting the inventory search noticed on the front seat a white powdery substance which he believed to be cocaine. The officer next inventoried the trunk. Upon opening the lid the officer was confronted by an overwhelming smell of marijuana. Inside the trunk were two large garbage bags. The officer opened the bags and observed what he believed was marijuana. He called over two officers to test the substance which turned out to be marijuana. The car was then towed to the police garage. At the garage a further search of the bags resulted in the discovery of one ounce of cocaine.

A few days after the car had been impounded, officers received an anonymous tip that there were still large amounts of money and drugs located in Trevino's car. The police employed a police dog who reacted in such a manner to alert the officers that drugs were in the car. Based on the tip and the dog "sniff" the officers obtained a warrant to search the car. This search revealed a secret compartment in the car's interior, in which were found a .380 pistol with 45 rounds of ammunition, and a plastic bag containing 12 individually wrapped one-ounce packages of cocaine, along with $9,110 in cash separated into four small freezer bags. Trevino's fingerprints were found on three of the four baggies containing the cash.

Trevino was charged with one count of possession with intent to distribute cocaine and one count of possession with intent to

distribute marijuana. Before trial, Trevino filed a motion to suppress the evidence obtained from his car on the grounds that the checkpoint stop violated the Fourth Amendment. Following a hearing, the district court denied the motion.

Trevino proceeded to a jury trial during which he renewed his motion to suppress which the district court again denied. Following trial, the jury convicted him on both counts in the indictment. Trevino filed a post-trial motion, raising the suppression issue; the district court denied this motion too. The court sentenced Trevino to a prison term of 68 months followed by three years of supervised release.

## II.

### A.  Motion to Suppress

■ Trevino claims that all the evidence obtained from the vehicle should be suppressed because it was the result of an unconstitutional checkpoint stop. His main complaint apparently is that the stop took him by surprise and was therefore unreasonably intrusive under the Fourth Amendment.

■ In reviewing a district court's ruling on a motion to suppress, we review questions of law *de novo*. *United States v. Baker*, 47 F.3d 691, 692 (5th Cir.1995). Any factual findings are reviewable for clear error. *United States v. Tilmon*, 19 F.3d 1221, 1223 (7th Cir.1994). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* at 1224. For purposes of our review the "entire evidence" consists of evidence introduced both at the suppression hearing and at the trial itself. *Id.*

■ We start with a brief overview of the general Fourth Amendment law that comes into play when analyzing the constitutionality of checkpoint stops. There is no question that stopping a vehicle at a checkpoint constitutes a seizure within the meaning of the Fourth Amendment. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990).

Constitutional challenges to this type of seizure turn on whether the initial stop at the checkpoint was reasonable. *Id.* This in turn requires a balance of the intrusion on the individual's Fourth Amendment rights occasioned by the initial stop against its promotion of legitimate governmental interests. *Sitz*, 496 U.S. at 449–50, 110 S.Ct. at 2484–85; *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). In performing this balance the Supreme Court has stated that we must consider both the "objective intrusion" of the seizure—the duration of the stop itself and the intensity of any brief questioning and visual inspection that might attend it, *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486—and its "subjective intrusion"—its potential for generating fear and surprise to law-abiding motorists. *Id.*

Trevino raises no challenge to the State's proffered reasons for conducting the stop, namely, its interests in detecting automobile equipment violations and in preventing uninsured or unlicensed motorists from operating their vehicles on the public roads and highways. Nor does he challenge the level of objective intrusion occasioned by the stop. Rather, he focuses exclusively on what he perceives as the high degree of subjective intrusion brought about by the circumstances surrounding this checkpoint and which in his opinion were not adequately considered by the district court in denying suppression. To hear Trevino describe it, while travelling at night on a seldom-traveled, unlit road, he came upon a group of people standing in the road motioning at him with their flashlights. Because there were no warning signs, barricades, flashing lights, flares, or squad car emergency lights, he claims that for all he knew he had come upon a band of highwaymen, not an official police checkpoint stop. He claims that the absence of any devices indicating an approaching checkpoint stop created such a high risk of engendering fear and surprise in the average law-abiding motorist that it was too subjectively intrusive to pass muster under the Fourth Amendment.

In making this argument, Trevino cites us to *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In that case, a checkpoint stop to

detect the presence of illegal aliens was located on a major highway near the Mexican border. Starting approximately a mile before reaching the checkpoint, motorists encountered large signs with flashing lights over the highway indicating that all approaching vehicles were required to stop at the U.S. Border Patrol station. Placed on the highway before the checkpoint were orange traffic cones funneling all motorists into two lanes where a uniformed Border Patrol agent checked all incoming motorists. In the other two lanes were official Border Patrol cars with flashing red lights. Trevino suggests that it was the presence of these various physical devices indicating to incoming motorists that they were approaching an official checkpoint which caused the Court in *Martinez–Fuerte* to hold that the Border Patrol checkpoint was valid under the Fourth Amendment. He submits that the absence of such devices here renders this checkpoint stop unconstitutional.

■ But the fact that such devices were present in the checkpoint upheld in *Martinez–Fuerte* does not lead to the conclusion that their absence in this case renders this checkpoint stop subjectively intrusive and thus invalid. The subjective intrusiveness of a checkpoint stop does not turn on how conspicuously it is set up or whether the state has provided motorists with sufficient advance warning so that they may avoid it. Rather, the Supreme Court's most recent checkpoint stop decision indicates that the critical factors in assessing a checkpoint's "subjective intrusion" are, first, whether it is set up in a manner which informs incoming motorists that this is an official stop and, secondly, whether it gives the officers conducting the stop unbridled discretion to randomly target individual motorists. In *Sitz*, the state of Michigan set up various checkpoints to detect drunk drivers at selected sites on state roads. According to the guidelines setting up the checkpoint program, all vehicles traveling through this checkpoint were briefly detained while uniformed officers asked the drivers a few questions and looked for signs of intoxication. The lower courts had held that since incoming motorists were not aware of their option to make a U-turn or turn off and avoid the checkpoint,

these checkpoints engendered a high degree of fear and surprise. Thus, the lower courts concluded that the checkpoints imposed an unreasonable level of subjective intrusion upon the incoming motorists. But the Supreme Court rejected the lower courts' conclusion. Instead, the Court found that the level of subjective intrusion brought about by this sobriety checkpoint, through which all incoming motorists were required to pass, was, for constitutional purposes, indistinguishable from the checkpoint upheld in *Martinez–Fuerte*. There, incoming motorists could see that the checkpoint was conducted by the authorities in a regular manner, applicable to all motorists. *Sitz*, 496 U.S. at 452–53, 110 S.Ct. at 2486–87. Thus, what was dispositive in *Sitz* was that pursuant to neutral guidelines uniformed officers conducting the checkpoint stopped every incoming vehicle, and were not at liberty to randomly decide which motorists would be stopped and which would not. In this manner incoming motorists could observe that the stop was official, and that it was being applied to everyone so that a reasonable motorist would have no reason to believe that he or she was a target of unbridled police discretion. *Sitz*, 496 U.S. at 452–53, 110 S.Ct. at 2486–87. Nowhere in its discussion of *Martinez–Fuerte* or in its assessment of Michigan's checkpoints did the Court in *Sitz* indicate that the presence of some sort of a warning indicating "checkpoint ahead" was an important consideration in determining the reasonableness of checkpoint stops. Nor did it matter that this stop would "surprise" motorists since it was set up to catch motorists traveling at night on local roads. Although the dissent was concerned with how an unavoidable checkpoint would startle and surprise unsuspecting motorist, *see Sitz*, 496 U.S. at 463, 110 S.Ct. at 2492 (Stevens, J., dissenting), this was not a concern to the majority of the *Sitz* Court. Thus we have no basis to believe that the Court would place great emphasis on the level of surprise or lack of physical warning devices when assessing the subjective intrusiveness of a checkpoint stop. Therefore we reject Trevino's request to read these considerations into the Court's Fourth Amendment analysis.

Our next step then is to determine whether under *Sitz* the checkpoint was subjectively intrusive. It was not. The evidence before the district court revealed that the officers conducting the stop were in uniform, and their official police cars were parked along the side of the road visible to incoming motorists. There is no evidence suggesting that incoming motorists were confused over whether the stop was conducted by the police or private citizens. Moreover, the checkpoint was administered according to guidelines established by the Peoria Police department, not the officers in the field. Consistent with those guidelines, the officers stopped every vehicle that approached; they were not free to decide which motorists would be stopped and which would not. Of course neither were the motorists able to anticipate and avoid the checkpoint, which is Trevino's basic complaint with it. *That* complaint is no longer valid after *Sitz*. Therefore, this checkpoint did not impose a substantial subjective intrusion upon incoming motorists; thus it passes constitutional muster. The district court was correct in denying Trevino's motion to suppress.

## B. Ineffective Assistance of Counsel

Trevino claims two instances of ineffective performance by his trial counsel, either of which, in his opinion, entitles him to a new trial. The first involves trial counsel's representation at all stages of his numerous attempts to suppress the evidence based on the constitutionality of the checkpoint stop. The second involves trial counsel's supposed failure to adequately cross-examine the government's fingerprint expert.

Before reaching the merits we briefly comment upon the difficulties in reviewing an ineffectiveness claim on direct appeal. Claims that an attorney was ineffective involve inquiries into the motivation behind an attorney's trial strategies. This in turn requires facts which are usually not contained in the trial record. Without such facts trial counsel's alleged lapses or errors will be presumed tactical moves, flawed only in hindsight. *United States v. Fish*, 34 F.3d 488, 491 n. 1 (7th Cir.1994); *United States v. Taglia*, 922 F.2d 413, 418 (7th Cir.), *cert.*

*denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). What is more, in the event the defendant pursues his claim on direct appeal and it is rejected, our decision will be binding on the district court through the law of the case doctrine, "leaving [defendant] with the unenviable task of convincing the district judge that he should disregard our previous ruling." *United States v. South*, 28 F.3d 619, 629 (7th Cir.1994). That is why we have often cautioned that "a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose." *Id.* (quotations and citations omitted). We reminded Trevino's appellate counsel of these matters at oral argument. He assured us that he was aware of the consequences of raising his claim at this time but wished to proceed nevertheless. Hence we will address the claim on direct appeal.

Regardless of when it is made, because counsel is presumed effective, a party bears a heavy burden in making out a winning claim based on ineffective assistance of counsel. In order to succeed, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that this deficient performance so prejudiced his defense as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984). With regard to the performance prong, defendant must direct us to the specific acts or omissions which form the basis of his claim. *Id.* at 690, 104 S.Ct. at 2066. The court must then determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance. *Id.* In making this determination we are mindful of the strong presumption that counsel's performance was reasonable. *Id.* at 698, 104 S.Ct. at 2070.

With respect to Trevino's first alleged instance of ineffectiveness we can be brief. Trevino's trial counsel aggressively pursued the suppression of the evidence found in the car. He filed a pretrial motion requesting the evidence be suppressed. Following the suppression hearing, during which he vigorously cross-examined the government's wit-

nesses, he filed a memorandum in which he challenged the duration of the initial checkpoint stop, along with the quality of evidence used to support the search of his car while it was in the custody of the Peoria Police department. At trial he renewed his motion to suppress. He even included a suppression challenge in his post-trial motion. Trevino acknowledges trial counsel's herculean efforts to suppress the evidence, but claims that counsel was nevertheless ineffective because he did not raise as an additional ground for suppression the argument raised by Trevino's subsequent counsel on direct appeal—that the checkpoint stop was unconstitutional because it involved a high degree of subjective intrusion. But as today's decision makes clear, this argument loses, so trial counsel obviously was not unreasonable for not pressing it below. And even if he had, the district court would have rejected it; hence no prejudice. Therefore this claim fails under both prongs of the ineffectiveness test.

█ Trevino next claims that trial counsel was ineffective because he failed to adequately cross-examine the government's fingerprint expert. Specifically, he argues that trial counsel failed to challenge the expert concerning the number of points of identification or about the uniqueness of any pattern of the fingerprints collected from the baggies which were found in the car's secret interior compartment. According to Trevino, such an attack upon the expert's testimony would have successfully severed the only link between Trevino and the cocaine.

We reject this claim. The record demonstrates that trial counsel pursued a clearly defined, strategic approach which was far more effective than quibbling with the government's fingerprint expert regarding his methodology used in determining that the fingerprints found on the baggies were Trevino's. Counsel brought out on cross-examination that the expert had not found any of Trevino's prints on the gun, the ammunition, nor the packages of cocaine. Counsel also established through the expert that fingerprints may stay on surfaces for weeks or even months after being touched. The expert further testified that he had no idea how long Trevino's prints had been on the baggies containing the money. During closing argument, counsel brought this portion of the expert's testimony to the attention of the jury. Counsel's argument was that Trevino's prints could have been on the bags for months and that the absence of his prints from the money itself, the weapon, the ammunition or the individual packages of cocaine demonstrated that he was in no way connected to the incriminating items found in the vehicle's secret compartment. This strategy employed the expert's own testimony to Trevino's advantage and avoided a challenge to the technical basis for his opinions, which would have further reinforced his testimony in the minds of the jury. This was a decent strategy; the jury just didn't buy it.

We further note that at sentencing the district court stated on the record that Trevino's trial counsel "[did] a very good job of trying to [portray] what happened here in the best possible light." Perhaps these comments led appellate counsel to conclude that any subsequent hearing on a § 2255 petition challenging the effectiveness of counsel would not get very far with this district judge. Thus, we have this long-shot challenge on direct appeal. In 1993, Judge Easterbrook observed that at that time there was not a single case from this circuit in which we had reversed a conviction on direct appeal because of ineffective assistance of counsel. *Guinan v. United States,* 6 F.3d 468, 473 (7th Cir.1993) (Easterbrook, J., concurring). To date, that record has not changed, and Trevino's challenge is no exception.

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.