**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Cheryl YACK, Defendant–Appellant.**

**No. 97–3491.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1998.

Decided April 9, 1998.

Before CUMMINGS, MANION, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Cheryl Yack appeals from her conviction following a jury trial for embezzling $115,000 from the Calumet National Bank (now known as Bank Calumet) of Indiana, in violation of 18 U.S.C. § 656, and for making false entries in the bank's records, in violation of 18 U.S.C. § 1005. Her contention in this appeal is that she was denied the effective assistance of counsel.

Yack began working for the bank in 1980 and became head teller at its Schererville branch in 1986. As head teller she was the custodian of the vault and one of only three people who had keys to open it. The other two were Martha Sandoval, the branch manager, and Lana Thompson, the assistant manager.

As one would hope, banks require tellers to balance their drawers by tracking the cash. At Bank Calumet at the time in question, if, for instance, a teller took in cash from a customer, she was required to generate a cash-in ticket. If she gave out money, as in a withdrawal, she had to generate a cash-out ticket. At the end of the day she was required to prepare a cash-out ticket for all the checks she cashed. Tellers also had cash limits. For a regular teller the limit was $12,000. To maintain the limit the teller would "buy" money from the vault, generating a cash-in ticket for her drawer and a cash-out ticket for the vault. The various cash tickets were sent to the proof department for processing and were photographed on microfilm.

At the end of a day the teller counted the cash in her drawer and also counted "cash items." Cash items were notations regarding money which a teller had given out but for which she had not yet received reimbursement—an IOU. Cash items were not sent to the proof department nor were they microfilmed, and they did not show up on the teller tape. When the teller received compensation for the IOU she filled out a cash-out ticket and removed the cash item. When

tellers were audited the legitimacy of the cash items was not verified; the items were simply counted.

At the Schererville branch, cash items were fairly small. One exception was money shipments from Schererville to another branch of the bank, the Inland Schererville branch. The Inland branch ordered cash every day but Wednesday to replenish its tellers and to maintain about $112,000 in its main cash box. The orders were for whatever amount was needed to accomplish that purpose. The Inland manager or assistant manager called in the cash order and then wrote a check to Bank Calumet. Items were transported between the branches by Brinks messenger, the cash going to Inland and Inland's check to Schererville.

As head teller, Yack was usually responsible for the Inland orders. She would buy money from the vault to fill the order, creating a cash-out for the vault and a cash-in for her drawer. The bank had a dual control policy, which meant that Yack was required to take another employee into the vault to verify the count of the money for the shipment. After verification the money was put into a bag, which was then tagged and sealed. The tag indicated the date, the amount of money in the bag, and the names of the persons who put it together. A Brinks log book was then prepared with the date, the number of bags in the shipment, and the destination. The bag remained in the vault until the Brinks messenger picked it up, at which time he was required to verify the value of shipment from the tags and sign the log book, indicating the number of items he was taking out of the vault.

The money was taken to Inland on one day and the check from Inland was returned to the Schererville branch the next day. Because of the one-day delay, the head teller carried the Inland order as a cash item in her teller drawer. If she were going to be gone the next day, she would sell the cash item to another teller. As head teller with these responsibilities, Yack was not subject to the $12,000 teller cash limit, but usually had over $100,000 in cash and tickets in her drawer.

About once a month the Schererville branch also shipped money and food stamps to the Federal Reserve. The procedure for these shipments differed a bit from the Inland shipments in that there was a separate Brinks log book for these shipments. A bank employee filled out the log book indicating what was being shipped, the date, and the amount; the messenger signed the book and indicated the number of items he received. The bank employee was also required to inform the main office of the shipment. The employee also made out a general ledger ticket indicating that there was a shipment to the Federal Reserve, a cash-out ticket for the vault, and a three-part, deposit-of-currency form. Two copies of the latter form were used as a tag on the Federal Reserve bag. The third copy was retained by the bank. The form showed which two employees prepared the shipment. After signing the log book and noting the number of items taken, the Brinks messenger would take the original page and leave a carbon copy in the Brinks log book.

A critical time for purposes of the charges against Yack is December 1994. As the government sees it, on the 7th she prepared a food-stamp shipment to the Federal Reserve. She filled out the documents, including the log book. Gerald Thomas, the Brinks messenger, signed for the shipment of food stamps to the Federal Reserve. On December 9th the assistant manager of Inland called in a replenishment order for $25,057.70 cash and prepared a check for that amount. Later that day the manager of Inland called in an additional order for $50,000 in currency. Yack bought money from the vault for the Inland order, showing a cash-in ticket to her drawer.

Also on December 9th Yack had teller Sophie Zdravski verify a count of $115,000, which Yack said was a shipment to the Federal Reserve. The money was counted, sealed in a bag, tagged for the Federal Reserve, and left in the vault. Yack prepared a cash-out ticket for the vault. That afternoon, Thomas, the Brinks messenger, arrived at the bank. He entered the vault with Yack, picked up two bags tagged for Inland, and signed the log book for the Inland shipment,

indicating that he was picking up two bags. Videotape from the bank's surveillance cameras shows Thomas leaving with two bags. He delivered two bags to Inland; those bags contained the $25,057.70 and $50,000 shipments.

After the two bags were taken away, Yack created paperwork for sales of cash from her drawer to the vault. She had previously prepared a cash-in ticket to the vault for the money. Because she was going on vacation, she sold the cash items for the two Inland orders to another teller, making Yack's teller drawer balance for December 9.

As to the Federal Reserve shipment, the government contends that Yack did not telephone the main office to report that she was making a shipment. She did, however, complete a general ledger debit ticket indicating a $115,000 shipment. She wrote her initials and those of her manager, Martha Sandoval, on the ticket. However, Sandoval was not aware that a shipment was contemplated. But when the main office of Bank Calumet learned of the supposed shipment and did not get credit from the Federal Reserve for the $115,000, someone called Sandoval, who, in turn, talked to the vacationing Yack at her home. Yack said she had made the shipment on Wednesday the 9th.

Because of the questions regarding the shipment, even though she was on vacation, Yack came into the bank on Friday. When she was told that the office wanted a copy of the receipt for the Federal Reserve shipment, she provided a carbon copy receipt, which had been torn out of a book. She explained that she tore the receipt out of the book because she could not make a copy of it while it was in the book. The receipt had the details Yack would have filled in on a receipt, but the signature of the messenger and his notation that he picked up one item were actually a carbon copy of the paperwork for the December 7th food stamp shipment. The form Yack provided also did not contain a date. It was not from the currently used Federal Reserve log book, a 1985 edition, but rather was a 1963 edition form, similar to forms in a book that was found to be missing its last page. The lines on the carbon did not align correctly with the newer log book.

The carbon paper used to create the receipt was found by the bank and turned over to the FBI. Also, in the Brinks receipt book for Inland shipments, on the form for the December 7th shipment, in the part filled out by Yack, the number of items had been changed with whiteout so that the book said that one item was shipped, rather than two. However, the part of the receipt filled out by the messenger indicated that he took two items. In short, much of the paperwork was bogus, allowing $115,000 in cash to disappear from the bank.

Because of the missing $115,000, the general auditor of Bank Calumet reviewed the records of Yack's transactions between December 1st and December 9th. Although the review was hampered by missing records as well as records which were routinely destroyed, the auditor found various fraudulent items. For instance, on December 1st Yack had three cash items in her drawer, only one of which was legitimate. Because of this and other similar transactions, the conclusion was that Yack had been concealing money that was already gone from the bank. The government, however, has never been able to find the missing money.

In its investigation of the missing funds, the FBI asked several bank employees to take polygraph examinations. Two people examined were Lana Thompson, the assistant manager, who as we said had keys to the vault, and teller Sophie Zdravski. The examiner considered that the responses of both employees were indicative of deceitfulness. Yack declined to take a polygraph examination.

Prior to her trial, the government filed a motion in limine, seeking to exclude from evidence the results of the polygraph examinations. Yack's attorneys—she had two—acquiesced to the request. It is this acquiescence and their failure to present allegedly exculpatory evidence that Yack's teller drawer balanced from July to December 1994 and their failure to seek discovery of cash memo slips and teller tapes which led Yack to argue that she was denied the effective assistance of counsel.

Yack raises this issue on direct appeal, which we have pointed out over and over is not a good idea. In fact, we have said that when the issue is raised on direct appeal, "alleged lapses or errors will be presumed tactical moves, flawed only in hindsight." *United States v. Trevino,* 60 F.3d 333, 338 (7th Cir.1995), *cert. denied,* 516 U.S. 1061, 116 S.Ct. 739, 133 L.Ed.2d 689 (1996); *United States v. Fish,* 34 F.3d 488 (7th Cir.1994). But, despite our pointed warning at oral argument, Yack has persisted with her claim in this proceeding.

The reason, of course, that it is recommended that claims of ineffective assistance of counsel be raised by way of a proceeding under 28 U.S.C. § 2255 is that the district court can then hold a hearing, if necessary, to learn what motivated attorneys to make the choices which were made.

That inquiry is relevant because in order to show ineffective assistance of counsel a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the performance prejudiced her. In assessing reasonableness we start with a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). When the issue is raised on direct appeal and no hearing has been held in the district court, we are compelled to speculate about what the reasons are for the strategic trial choices which were made.

■ Yack's attorneys' agreement that the polygraph evidence would not be admitted might have been motivated by any number of legitimate considerations. First and foremost is the fact that the evidence cuts both ways. The examiner found evidence of deception on the part of both Thompson and Zdravski when they were asked about the theft. That conclusion may not be as helpful to Yack as she wants us to believe. Thompson was a relatively unimportant witness for the government. She testified that the bogus Federal Reserve sheet had been ripped out of an old book and that she searched Yack's trash for certain missing teller tickets. Yack herself admitted the former fact in her testimony. Zdravski, on the other hand, was a defense witness. Yack needed Zdravski's testimony to support the claim that Yack had prepared the Federal Reserve shipment in accordance with bank procedure. Yack would, therefore, not benefit by an attack on Zdravski's credibility.

Yack argues that, had the jury known that Thompson failed the polygraph test, it would have seen Thompson as the most obvious suspect—an attractive alternative to Yack. That, of course, is speculation. In addition, were the results of the polygraph tests admitted, the jury might have learned that Yack herself had refused in the first instance to take a polygraph. Yack's refusal might cause the jury to ask questions she would as soon ignore. We presume counsel were leery of playing with the fire of the polygraph results.

■ Yack also cannot satisfy us that the polygraph evidence would have been admitted over the government's objections, regardless of what she agreed or did not agree to. Although the decision on the admissibility of polygraph results is committed to the discretion of the trial judge, *United States v. Olson,* 978 F.2d 1472 (7th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993), it seems likely to us that in this circumstance, given the relative insignificance of the evidence to this trial, the judge would have excluded it—if for no other reason that to avoid the collateral testimony it would engender. If the evidence were admitted, there would likely be testimony regarding whether these particular tests were properly administered, testimony which a trial judge would want to avoid if at all possible. For these and other reasons, we conclude that agreeing to the exclusion of the evidence was within the realm of reasonable representation and that, even if it weren't, no prejudice can be shown.

■ The other contentions are that Yack's trial attorneys did not present or ob-

tain exculpatory evidence. The evidence not presented was that Yack's teller drawer balanced from June on. The problem is that no one contends that it didn't. The government's contention is that it balanced because of bogus cash items, not that it did not balance. Yack also claims that counsel should have obtained discovery of more bank records. It is speculative whether those records would have been exculpatory. The records which were examined—through what the government contends was a time-consuming process-showed fraud. Even if some records could have been discovered which would show that a large number of transactions were not fraudulent, that has no relevance to the ones which were. In order to obtain a conviction the government need not show that Yack avoided legitimate activities altogether.

The judgment of the district court is AFFIRMED.