165 F.3d 33
 82 A.F.T.R.2d 98-5862
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Scott DANTUMA, Defendant-Appellant.
 No. 97-3077.
 United States Court of Appeals, Seventh Circuit.
 Argued May 19, 1998.
Decided Aug. 18, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 CR 119. George M. Marovich, Judge.
 Before Hon. RICHARD D. CUDAHY, Hon. FRANK H. EASTERBROOK, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 After a bench trial, Scott Dantuma was convicted of three counts of bankruptcy fraud in violation of 18 U.S.C. § 152, and three counts of making false statements on his tax returns in violation of 26 U.S.C. § 7206(1). The district court sentenced Dantuma to 18 months' imprisonment and three years' supervised release, and ordered him to pay $20,000 in restitution and a $300 special assessment. On appeal, Dantuma argues that his trial counsel was ineffective and that the evidence does not support his convictions. He also contends that his offenses are "closely related" and that therefore the district court should have grouped them pursuant to United States Sentencing Guideline (U.S.S.G.) § 3D1.2. We affirm.
 
 I. Ineffective Assistance of Counsel
 
 2
 To obtain a conviction under 18 U.S.C. § 152 and 26 U.S.C. § 7206(1), the government had to prove that Dantuma knew he was required to make various disclosures to the bankruptcy trustee and to the IRS, and nonetheless failed to do so. Dantuma argues that his trial counsel's ineffectiveness deprived him of the opportunity to argue that he acted in good faith based upon his understanding of the law and his reliance on the advice of counsel and others. Specifically, Dantuma claims that his trial counsel failed: (1) to investigate and subpoena witnesses who would have supported his good faith defense; (2) to cross-examine government witnesses who would have corroborated this defense; (3) to present and argue the relevant law; and (4) to prepare Dantuma for taking the stand. In order to prevail on his ineffective assistance claim, Dantuma must demonstrate that his counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v.. Washington, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 
 3
 Before addressing the merits of Dantuma's claim, we say a word about its timing. At oral argument, we asked Dantuma's counsel whether the defendant understood the risks of raising the ineffective assistance issue on direct appeal, instead of in a motion for a new trial under 28 U.S.C. § 2255. Because appellate courts do not take evidence, Dantuma must support the challenge to his trial counsel's effectiveness on the "unadorned trial record." United States v. Taglia, 922 F.2d 413, 417 (7 th Cir.1991). And when an ineffective assistance claim is based only on the trial record, "every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." Id. at 417-18. This indulgence means that raising an ineffective assistance claim on direct appeal is a risky business. See Bond v. United States, 1 F.3d 631, 635 (7 th Cir.1993). As Judge Easterbrook reminded Dantuma's counsel, when the issue has been raised on direct appeal, this circuit has never reversed a conviction on the ground that counsel was ineffective. See United States v. Trevino, 60 F.3d 333, 339 (7 th Cir.1995); Guinan v. United States, 6 F.3d 468, 473 (7 th Cir.1993) (Easterbrook, J., concurring). Despite these (to put it mildly) unfavorable odds, Dantuma's counsel assured us that the defendant wanted to proceed at this juncture. In light of this assurance and because we do not ordinarily prevent an appellant from presenting an argument simply because the probability of success is low, see Guinan, 6 F.3d at 472-73, we will address Dantuma's ineffective assistance claim, see Trevino, 60 F.3d at 338; United States v. South, 28 F.3d 619, 629-30 (7 th Cir.1994).
 
 
 4
 However, because we have decided to address the ineffectiveness claim at this juncture, we cannot consider arguments relating to trial counsel's alleged failure to prepare Dantuma before calling him to testify. While certain parts of Dantuma's testimony could serve as a primer on what not to say when testifying in one's own defense, the unadorned trial record does not indicate that Dantuma received no preparation. This allegation is contained in Dantuma's affidavit, which was attached to the post-trial motions for judgment of acquittal or for a new trial. These motions were filed more than four months after the bench trial ended, when Dantuma employed a new attorney. The district court properly dismissed the post-trial motions as untimely. See Fed.R.Crim.P. 29(c); Fed.R.Crim.P. 33. Dantuma's affidavit is therefore not part of the trial record. See United States v. Ellison, 557 F.2d 128, 131 (7 th Cir.1977); see also Taglia, 922 F.2d at 417; cf. Gonzalez v. Ingersoll Milling Machine Co., 133 F.3d 1025, 1031 (7 th Cir.1998) (finding that a Local Rule 12(n) statement and attached affidavit were not part of the record because they were untimely). As such, we cannot consider the ramifications of trial counsel's alleged failure to prepare Dantuma for his testimony.
 
 
 5
 Dantuma's other arguments also fail, albeit for slightly different reasons. Dantuma points to a number of individuals who were never called to testify on his behalf-his divorce attorney, his bankruptcy attorney, two of his business associates, unspecified experts in estate planning and asset protection, and Arnold Goldstein (a bankruptcy expert on whom Dantuma allegedly relied). Dantuma contends that these individuals would lend support to his defense that he acted in good faith when he decided not to report certain items to the bankruptcy trustee and to the IRS. But because Dantuma has raised his claim on direct appeal, there is a fundamental problem. Nothing in the record indicates what these potential witnesses would have testified, and therefore we have no means of knowing whether they really would have been helpful to Dantuma.[1] Cf. Duarte v. United States, 81 F.3d 75, 76 (7 th Cir.1996). Indeed, it is easy to characterize the failure to call this laundry list of witnesses as "within the broad range of sound trial strategy." United States v. McKinley, 23 F.3d 181, 185 (7 th Cir.1994). Consider, for example, Dantuma's divorce lawyer. Dantuma suggests that the lawyer would have testified that the defendant did not believe that he had an interest in three of the four properties that formed the basis of one of the bankruptcy convictions. However, prior to the bankruptcy proceeding, the divorce lawyer helped Dantuma obtain a temporary restraining order to prevent his soon-to-be-ex-wife from selling the properties. In the process, Dantuma signed an affidavit in which he alleged an equitable interest in the properties. Given this affidavit, one might expect the divorce attorney's testimony to contradict Dantuma's assertion that he believed-even at the time of the divorce-that he had no interest in the properties. It therefore may have been sound legal strategy to deny Dantuma the "benefit" of his divorce lawyer's testimony. We can make the same basic point about the other individuals who supposedly should have testified-because the record contains no indication that their testimony would have been helpful, Dantuma cannot overcome the presumption that trial counsel made a tactical decision not to call them as witnesses. See id.; Taglia, 922 F.2d at 418.
 
 
 6
 Relatedly, Dantuma criticizes trial counsel for failing to cross-examine government witnesses who allegedly would have corroborated Dantuma's long-standing relationship with Arnold Goldstein. Again, we have no means of knowing what these witnesses would have said had they been subjected to the sort of cross-examination Dantuma envisions. And even more fundamentally, there was probably no need for trial counsel to elicit testimony from government witnesses about the association between Dantuma and Goldstein, since this issue was not disputed. See Op. of 1/17/97 ("I see Mr. Dantuma as the Principal Apostle of the Guru Goldstein...."). Finally, our review of the trial transcript shows that counsel generally conducted aggressive and extensive cross-examination. Accordingly, Dantuma has failed to overcome the presumption that trial counsel made a tactical decision not to ask the government's witnesses about Dantuma's relationship with Goldstein.
 
 
 7
 Lastly, Dantuma faults his trial counsel for: (1) not citing legal authority in support of his good faith defense; (2) not moving for a judgment of acquittal at the close of the government's case and at the end of the trial; and (3) not filing post-trial motions. With respect to the first alleged error, the record plainly establishes that the district judge understood the relevant law and was alert to the defense of good faith. See, e.g., Op. of 1/17/97 at 8 ("The Court is aware that state of mind is an element."); Tr. 526, 548. In regard to the motion for a judgment of acquittal, the chances of success were slim because the district judge sat as the trier of fact. Indeed, in his untimely post-trial motion, Dantuma requested a judgment of acquittal based on an alleged insufficiency of the evidence. As will become apparent, this argument lacks merit. And finally, with respect to post-trial motions, Dantuma does not suggest what issues his trial counsel might have raised. The untimely motion filed by Dantuma's new attorney argued insufficiency of the evidence-on which Dantuma cannot prevail-and ineffective assistance of counsel. Even assuming that trial counsel would have taken the unlikely step of arguing that his own performance was ineffective, Rule 33 required him to raise this argument within seven days of the guilty verdict. Trial counsel may have determined that more time was necessary to gather extrinsic evidence to support the claim. See Taglia, 922 F.2d at 417. In sum, then, all of the omissions on the part of trial counsel can be construed as sound strategic decisions.
 
 II. Insufficiency of the Evidence
 
 8
 Dantuma contends that the evidence was insufficient to support one of his convictions for bankruptcy fraud and his convictions for making false statements on his tax returns. As is well-established, we reverse a conviction for insufficiency of the evidence "only if, viewing the evidence in the light most favorable to the prosecution ... no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v.. Ellis, 50 F.3d 419, 422 (7 th Cir1995).
 
 
 9
 Dantuma first argues that the evidence did not support his conviction on Count 2 of the indictment, which alleged that Dantuma represented in a bankruptcy proceeding that he had no interest in any real property, when in fact he knew that he had interest in four properties. To convict Dantuma under 18 U.S.C. § 152, the government had to establish that (1) a bankruptcy proceeding existed; (2) Dantuma made a statement relating to the proceeding; (3) the statement was under penalty of perjury; (4) the statement related to a material matter; (5) the statement was false; and (6) the statement was made knowingly and fraudulently. See id. The only issue that Dantuma disputes is whether the evidence established that he made his misrepresentation knowingly.
 
 
 10
 With respect to three of the properties (located in Bartlett, Illinois; South Barrington, Illinois; and Coral Springs, Florida), Dantuma emphasizes that at the time of the bankruptcy proceeding, the properties were in a trust, with his former wife holding the beneficial interest. But, as we have already explained, in his divorce proceeding (which predated the bankruptcy proceeding by eight months), Dantuma sought and obtained a temporary restraining order (TRO) that prevented his wife from selling the property. In support of his motion for the TRO, Dantuma signed an affidavit alleging an equitable interest in the properties. This affidavit is enough to support the district court's finding that Dantuma knowingly misrepresented his interests. And with respect to the fourth property (located in St. Charles, Illinois), Dantuma essentially admitted on cross-examination that he structured the ownership of the property so as to conceal it from his creditors. Tr. 569-70. Moreover, Dantuma had at least some expertise in the bankruptcy code, since he made his living by advising businesses how to avoid bankruptcy and protect their assets from creditors. All of this evidence supports the district judge's conclusion that Dantuma acted knowingly when he failed to disclose his interest in real property to the bankruptcy trustee.[2]
 
 
 11
 The district court also found that Dantuma willfully made false statements on his 1991, 1992 and 1993 tax returns, in violation of 26 U.S.C. § 7206(1). On appeal, Dantuma invokes Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1990), to argue that the government failed to prove that he acted willfully. As Cheek explains, "Willfulness ... requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." Id. at 201.
 
 
 12
 The most obvious response is that Dantuma's brief only focuses on certain payments from Magna Pacific Corporation and Corporate Financial Recovery. Dantuma contended that he thought these disbursements were shareholders loans; the government argued (and the district court believed) that the payments were salary, and understood to be such by Dantuma. But the government alleged other wrongdoing in 1991, 1992 and 1993. And in the district court the parties agreed that, if proven, each of these allegations was enough to support Dantuma's conviction. In 1991, for example, Dantuma failed to report $7,200 in W-2 income, as well as payments that were made for his clothing, his children's tuition and various living expenses. In 1992, he did not declare $500 in W-2 income and $10,400 that had been drawn from Magna Pacific's payroll account and was never classified as a loan. In 1993, he failed to report $10,200 in "management fees." And the evidence showed that the defendant knew that such fees were income, since Dantuma told his accountant that he wanted to keep management fees low to improve his position in a negotiation with the IRS regarding outstanding civil penalties. Tr. 270. Because Dantuma does not challenge the sufficiency of the evidence with respect to these instances of wrongdoing, the verdict on the tax counts must stand.
 
 
 13
 But the more fundamental response to Dantuma's argument is that the government also met its burden with respect to the alleged shareholder loans-$54,131.46 in 1991, $25,280 in 1992, and the $11,000 in 1993. Despite Dantuma's protestations to the contrary, the district court did not run afoul of Cheek by faulting the defendant for the honestly-held but unreasonable belief that he had received loans. Rather, the district court found that Dantuma attempted to disguise his salary by deeming it a loan. And the evidence to support this conclusion is overwhelming. There were no loan agreements, monies were disbursed at approximately bimonthly intervals, and Dantuma made no effort to repay. Moreover, when Dantuma put one of the "loaning" companies through an assignment for the benefit of its creditors, the only asset that Dantuma reported was a $13 checking account-he made no mention of the funds he supposedly owed the company. On appeal, Dantuma emphasizes that he testified that he did not believe the money was income. But the district court was entitled to disbelieve Dantuma, particularly in light of all the evidence that was contrary to his position.
 
 III. Sentencing
 
 14
 Finally, Dantuma contends that the district court should have grouped his bankruptcy and tax counts pursuant to U.S.S.G. § 3D1.2(d)-an issue we review de novo. See United States v. Wilson, 98 F.3d 281, 282 (7 th Cir.1996). Section 3D1.2(d) "categorizes offenses in three ways: (1) offenses that should be grouped for sentencing; (2) offenses that should not be grouped for sentencing; and (3) offenses for which the decision regarding grouping should be made on a case-by-case basis." United States v.. Harper, 972 F.2d 321, 322 (11 th Cir.1992). Dantuma's bankruptcy and tax counts are covered by U.S.S.G. § 2F1.1 and U.S.S.G. § 2T1.1, respectively. And, as Dantuma emphasizes, § 3D1.2(d) specifies that offenses falling under these provisions should be grouped.
 
 
 15
 But this is not to say that the district court should have automatically grouped Dantuma's offenses. See Wilson, 98 F.3d at 283. The primary purpose of § 3D1.2 is to combine counts that are "closely related." Id. at 282 (internal quotation marks and citations omitted). The sixth application note to § 3D1.2 explains that counts "are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection." While it is true that Dantuma's bankruptcy and tax counts are of the same general type because the offense level for each "is determined largely on the basis of the total amount of harm or loss," see Wilson, 98 F.3d at 283, Dantuma's offenses do not "otherwise meet the criteria for grouping." The background commentary to § 3D1.2 states that a "primary consideration" is whether the offenses involve different victims. Here the district judge rightly concluded that Dantuma's creditors were the victims of his bankruptcy fraud, and that "you and I and all the other taxpayers of the United States" were the victims of Dantuma's tax fraud. Sent. Tr. 45. (Or, in the language of the Guidelines, that the "victim" of the tax fraud was the societal interest protected by the tax laws. See U.S.S.G. § 3D1.2, app. note 2.)
 
 
 16
 Dantuma invokes Wilson, supra, and United States v. Emerson, 128 F.3d 557 (7 th Cir.1997), in an attempt to convince us that his offenses are closely related despite the different victims. But these cases, in which mail fraud counts were properly grouped with money laundering counts, are inapplicable. The most important point in Wilson and Emerson was that "money laundering served the necessary purpose of concealing the fraud, keeping the scheme afloat, and perpetuating the scheme that produced the laundered funds." Emerson, 128 F.3d at 564. There was thus "intuitive force to the argument that the victim of the fraud is also a victim of the transaction designed to hide or 'cleanse' the funds of which she was defrauded." Wilson, 98 F.3d at 283. Dantuma's bankruptcy fraud, however, was not in furtherance of his tax fraud, nor vice-versa. Indeed, much of Dantuma's tax fraud-such as treating his children's tuition as a business expense-was wholly unconnected to what occurred in the bankruptcy court. In sum, the district court did not err in refusing to group Dantuma's counts under § 3D1.2.
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 An affidavit from Arnold Goldstein was attached to Dantuma's post-trial motions. For reasons we have already explained, the affidavit is not part of the trial record. We note, however, that the affidavit suggests that Goldstein ultimately would have been unable to help Dantuma. Goldstein would have testified about one of the four properties that formed the basis of Count 2 of the indictment, which charged Dantuma with knowingly failing to report his interest in real property to the bankruptcy trustee. The parties agreed that to support a conviction on Count 2, the government had to prove fraud with respect to only one of the properties. Thus, even assuming that Goldstein would have established that Dantuma did not act knowingly with respect to one of the properties, Goldstein would not have prevented a conviction on Count 2, because the district court concluded that Dantuma knew of interests in three other properties. See Op. of 1/17/97 at 5
 
 
 [2]
 The foregoing discussion only considers conduct that occurred prior to the bankruptcy. Dantuma criticizes the district judge for relying on subsequent events as indicators of the defendant's state of mind during the bankruptcy proceeding. (This evidence included a letter in which Dantuma described the St. Charles property as his own and Dantuma's receipt of $25,000 upon the sale of that property.) But Dantuma does not expressly argue that the district court abused its discretion in deciding that this evidence was relevant, nor would we make such a finding. In United States v. Betts, on which Dantuma relies, we noted that subsequent conduct "is far less likely [than prior conduct] to illuminate the defendant's state of mind on an earlier occasion." See 16 F.3d 748, 758 (7 th Cir.1994), abrograted on other grounds by United States v. Mills, 122 F.3d 346 (7 th Cir.1997). However, Betts did not hold that subsequent activity is never probative of a defendant's intent. And here Dantuma's subsequent conduct is highly relevant to his state of mind at the time of the bankruptcy. Simply stated, Dantuma's prior and subsequent conduct illustrate that he consistently represented himself as having an interest in the various properties-except during the bankruptcy proceeding, when it would have been to his disadvantage to do so. Given these pattern, Dantuma's subsequent activities were relevant to his intent during the bankruptcy proceeding